IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 21-cv-1681 |
| | ) | |
| PHARMACIA LLC (formerly known as | ) | |
| MONSANTO CO.) and SOLUTIA INC. | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**CONSENT DECREE FOR REMEDIAL DESIGN/REMEDIAL ACTION
AND RECOVERY OF RESPONSE COSTS
FOR OPERABLE UNIT 1 SAUGET AREA 2 SUPERFUND SITE**

# TABLE OF CONTENTS

I.      BACKGROUND ................................................................................................... 1
II.     JURISDICTION .................................................................................................... 7
III.    PARTIES BOUND ................................................................................................ 7
IV.    DEFINITIONS ...................................................................................................... 8
V.      GENERAL PROVISIONS ................................................................................. 18
VI.    PERFORMANCE OF THE WORK................................................................... 20
VII.   REMEDY REVIEW ........................................................................................... 24
VIII.   PROPERTY REQUIREMENTS ........................................................................ 24
IX.    FINANCIAL ASSURANCE .............................................................................. 28
X.      PAYMENTS FOR RESPONSE COSTS ........................................................... 33
XI.    DISBURSEMENT OF SPECIAL ACCOUNT FUNDS ................................... 37
XII.   INDEMNIFICATION AND INSURANCE........................................................ 44
XIII.   FORCE MAJEURE ............................................................................................ 46
XIV.   DISPUTE RESOLUTION .................................................................................. 48
XV.   STIPULATED PENALTIES............................................................................... 52
XVI.   COVENANTS BY THE UNITED STATES ...................................................... 57
XVII.   COVENANTS BY SETTLING DEFENDANTS ......................................... 61
XVIII.   EFFECT OF SETTLEMENT; CONTRIBUTION ...................................... 66
XIX.   ACCESS TO INFORMATION ........................................................................... 68
XX.   RETENTION OF RECORDS ............................................................................ 70
XXI.   NOTICES AND SUBMISSIONS ..................................................................... 71
XXII.   RETENTION OF JURISDICTION.................................................................... 74
XXIII.   APPENDICES .................................................................................................... 74
XXIV.   MODIFICATION ............................................................................................... 75
XXV.   LODGING AND OPPORTUNITY FOR PUBLIC COMMENT .............................. 75
XXVI.   SIGNATORIES/SERVICE ................................................................................ 76
XXVII.   FINAL JUDGMENT ......................................................................................... 76

# I.    BACKGROUND

A.    This Remedial Design/Remedial Action ("RD/RA") consent decree ("CD") between the United States and the Settling Defendants ("SDs") Pharmacia LLC ("Pharmacia") and Solutia Inc. ("Solutia"), Settling Non-Performing Owners Eagle Marine and the Village of Sauget, and Settling Non-Participating Parties listed in Appendix A implements the remedy set forth in EPA's December 16, 2013 Record of Decision involving Operable Unit 1 ("OU 1") of the Sauget Area 2 Superfund Site in Sauget and Cahokia, St. Clair County, Illinois, for Sites O, Q, R, and S. OU 1 of Sauget Area 2 is comprised of contaminated soils, sediments, and surface water, as well as groundwater and surface water contamination source areas. The remedy for Site P of OU 1 of Sauget Area 2 is addressed in the consent decree entered on April 24, 2019, in *United States v. Ameren Missouri, et. al.*, Civil Action No. 19-231 (S.D. Ill.). Recovery of unreimbursed response costs for all of OU 1 of Sauget Area 2 is addressed in this CD. This CD does not address Sauget Area 1 or other sites within Sauget Area 2 or contaminated groundwater. The United States Environmental Protection Agency ("EPA") intends to address Sauget area-wide groundwater contamination in Sauget Areas 1 and 2 as a separate operable unit.

B.    The United States of America ("United States"), on behalf of the Administrator of EPA, filed a complaint in this matter pursuant to Sections 106 and 107 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9606 and 9607.

C.    The United States in its complaint seeks, *inter alia*: (1) reimbursement of costs incurred by EPA and the Department of Justice ("DOJ") for response actions throughout OU 1

of the Sauget Area 2 Superfund Site in St. Clair County, Illinois, together with accrued interest; and performance of response actions by the defendants at Sites O, Q, R, and S of OU 1 of Sauget Area 2 consistent with the National Contingency Plan, 40 C.F.R. Part 300 ("NCP").

D.      EPA and the State, through the Illinois Environmental Protection Agency ("IEPA"), have been investigating the Sauget Areas 1 and 2 Sites since the early 1980s. The Sauget Area 1 Site consists of three closed landfills (Sites G, H, and I); two former surface impoundments (Site L); one flooded borrow pit (Site M); one filled borrow pit (Site N); and a stream known as Dead Creek and its Creek Segments ("CS") A through F. The Sauget Area 2 Site consists of five inactive disposal areas (Sites O, P, Q, R, and S). Of these five disposal sites, three are closed landfills (Sites P, Q, and R), one consists of four closed sludge lagoons (Site O), and one is a waste disposal site (Site S) associated with an abandoned solvent reclamation facility.

E.      In 1995, EPA conducted a fund-lead removal action along the shore of the Mississippi River at Site Q Central, removing soils contaminated with polychlorinated biphenyls ("PCBs") and drums exposed by erosion during river flooding. In 1999 and 2000, EPA completed a second, larger removal action at Site Q South. In that action, EPA excavated waste from eight different areas on 25 acres of Site Q South. Approximately 17,032 tons of waste, comprised of about 20 percent low-level waste (soil concentrations less than 50 parts per million (ppm) of PCBs) and 80 percent high-level waste (soil concentrations greater than 50 ppm of PCBs), were shipped off-Site for disposal. In addition, 3,271 drums were removed and disposed off-Site.

F.      In 2000, EPA entered into an Administrative Order on Consent ("AOC") with a subset of potentially responsible parties ("PRPs") in Sauget Area 2 to conduct a remedial

2

investigation/feasibility study ("RI/FS") at the five Sauget Area 2 waste disposal sites (Sites O, P, Q, R, and S) to investigate and assess the cleanup necessary to be completed at these sites. The PRPs conducted RI activities from June 2002 through October 2002 under the AOC, with EPA oversight. EPA's review of the draft RI/FS report submitted in 2004 determined that supplemental investigation ("SI") work was necessary to fill data gaps. The PRPs' supplemental investigation work consisted of the following: additional field investigations, installation of monitoring well clusters, non-aqueous phase liquids ("NAPLs") investigation, vapor intrusion investigation, principal threat waste investigation, and completion of a regional fate and transport groundwater model to fill data gaps in the RI/FS. During the RI and SI from 2002 through 2007, the PRPs conducted extensive site investigations of disposal areas, groundwater, surface water, air, waste, and soil. EPA evaluated the results of these investigation studies in the Final Feasibility Study Report for the Sauget Area 2 Sites Group issued in May 2013.

   G. On October 4, 2006, the United States filed a Complaint against 22 PRPs, asserting a claim under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), for recovery of past costs related to the removal action at Site Q and a claim for declaratory judgment to recover future response costs related to the removal action at Site Q. *United States v. Afton Chemical Corp., et al.*, Civil Action No. 06-763-GPG. On the same date, the United States lodged a consent decree resolving these claims with all defendants except for the Estate of Paul Sauget. On January 30, 2007, the Court entered that consent decree, requiring payment of $2.6 million of the United States' past response costs. On September 21, 2007, the United States entered into a cost recovery consent decree with the Estate of Paul Sauget, which contained a stipulated judgment (based on a finding of inability to pay) in the amount of $351,000. On February 19, 2008, the Court entered the consent decree with the Estate of Paul Sauget.

H.      In 2002, EPA issued a unilateral administrative order ("UAO") to 76 Sauget Area 2 PRPs to perform an interim groundwater remedy by capturing and treating a groundwater plume releasing into the Mississippi River. The PRPs, led by Solutia and Pharmacia, installed and continue to operate the required remedial action, referred to as the "Groundwater Migration Control System" or "GMCS" at the Site. The GMCS consists of a 140-foot deep, 3500-foot wide "U"-shaped, fully penetrating jet grouted barrier wall and groundwater extraction wells, located adjacent to Site R near the Mississippi River. The installation was completed in 2005. The principal threat wastes identified on Site Q North and Site R, as well as the non-aqueous phase liquids located at these two sites, are captured by the GMCS and treated by the Village of Sauget American Bottoms Regional Water Treatment Facility ("ABRTF"). On February 8, 2013, the United States filed a complaint against Defendants Solutia and Pharmacia in the United States District Court for Southern District of Illinois for recovery of the United States' unreimbursed response costs incurred in connection with the UAO. *United States v. Pharmacia LLC and Solutia Inc.*, Civil Action No. 13-138 (S.D. Ill.). On May 19, 2015, the Court entered a consent decree resolving that cost recovery action.

I.      From 1917 to 1997, Pharmacia (formerly known as Monsanto Company) owned and operated what came to be known as the Krummrich Plant in Sauget, Illinois. From 1917 to 1977, Pharmacia owned and operated what came to be known as the Queeny Plant in St. Louis, Missouri.

J.      In 1997, Pharmacia spun off its chemical manufacturing business that included the Krummrich plant, to Solutia. Solutia is the current owner of the Krummrich plant and associated real property. Solutia and Pharmacia entered into an indemnification agreement whereby Solutia assumed financial responsibility for certain environmental claims arising from

4

Pharmacia's chemical manufacturing business, including claims under CERCLA with respect to, *inter alia*, the Sauget Area 2 Site (as defined below and depicted on the map in Appendix B).

K.      In February 2000, Monsanto Ag Company was incorporated as a wholly-owned subsidiary of Pharmacia. In March 2000, Pharmacia merged with Pharmacia & Upjohn Inc. and changed its name from Monsanto Ag Company to Pharmacia Corporation. In March 2000, the Monsanto Ag Company subsidiary changed its name to Monsanto Company (hereinafter "New Monsanto"). In 2002, Pharmacia spun off New Monsanto as an independent public company. Pharmacia Corporation was purchased by Pfizer Inc. in April 2003 and is maintained as a wholly-owned subsidiary of Pfizer Inc. In 2012, Pharmacia Corporation converted to a limited liability company and changed its name to Pharmacia LLC.

L.      Pursuant to the September 1, 2000 Separation Agreement between New Monsanto and Pharmacia, New Monsanto indemnified Pharmacia for certain liabilities, including environmental liabilities related to the Sauget Area 2 Site, to the extent that Solutia fails to pay, perform, or discharge those liabilities.

M.      Sauget Area 2 has been proposed for placement on the National Priorities List, 40 C.F.R. Part 300, Appendix B.

N.      The decision by EPA on the remedial action to be implemented for OU 1 at Sauget Area 2 is embodied in a final Record of Decision ("ROD"), executed on December 16, 2013, on which the State had a reasonable opportunity to review and comment and on which the State has given its concurrence. The ROD includes EPA's explanation for any significant differences between the final plan and the proposed plan, as well as a responsiveness summary to the public comments. Notice of the final plan was published in accordance with Section 117(b) of CERCLA, 42 U.S.C. § 9617(b).

5

O.     In accordance with the NCP, 40 C.F.R. Part 300 and Section 121(f)(1)(F) of CERCLA, 42 U.S.C. § 9621(f)(1)(F), EPA notified the State of Illinois (the "State") on August 1, 2017, of negotiations with PRPs regarding the implementation of the RD/RA for the Site, and EPA has provided the State with an opportunity to participate in such negotiations and be a party to this CD. The State, through the IEPA, has not objected to this CD.

P.     In accordance with Section 122(j)(1) of CERCLA, 42 U.S.C. § 9622(j)(1), EPA notified the United States Fish and Wildlife Service on August 1, 2017, of negotiations with PRPs regarding the release of hazardous substances that may have resulted in injury to the natural resources under federal trusteeship and encouraged the trustee to participate in the negotiation of this CD.

Q.     EPA also notified the Illinois Department of Natural Resources and IEPA of negotiations with the PRPs regarding the release of hazardous substances that may have resulted in injury to the natural resources under state trusteeship and encouraged these trustees to participate in the negotiation of this CD.

R.     The SDs, Settling Non-Performing Owners, and Settling Non-Participating Parties that have entered into this CD do not admit any liability to the United States arising out of the transactions or occurrences alleged in the complaint.

S.     Based upon the information presently available to EPA, EPA believes that the Work will be properly and promptly conducted by SDs if conducted in accordance with this CD and its appendices.

T.     Solely for the purposes of Section 113(j) of CERCLA, 42 U.S.C. § 9613(j), the remedy set forth in the ROD and the Work to be performed by SDs shall constitute a

6

response action taken or ordered by the President for which judicial review shall be limited to the administrative record.

U.     The Parties recognize, and the Court by entering this CD finds, that this CD has been negotiated by the Parties in good faith and implementation of this CD will expedite the cleanup of the Site and will avoid prolonged and complicated litigation between the Parties, and that this CD is fair, reasonable, and in the public interest.

NOW, THEREFORE, it is hereby Ordered, Adjudged, and Decreed:

## II.     JURISDICTION

1.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1345, and 42 U.S.C. §§ 9606, 9607, and 9613(b). This Court also has personal jurisdiction over SDs, Settling Non-Participating Parties, and Settling Non-Performing Owners. Solely for the purposes of this CD and the underlying complaint, SDs waive all objections and defenses that they may have to jurisdiction of the Court or to venue in this District. SDs, Settling Non-Participating Parties, and Settling Non-Performing Owners shall not challenge the terms of this CD or this Court's jurisdiction to enter and enforce this CD. The Settling Non-Participating Parties and Settling Non-Performing Owners are joined as permissive parties in this action pursuant to Fed. R. of Civ. P. 20.

## III.     PARTIES BOUND

2.     This CD is binding upon the United States, and upon SDs and their successors and assigns, upon Settling Non-Performing Owners and their heirs, successors, and assigns, and upon Settling Non-Participating Parties and their successors and assigns. Any change in

7

ownership or corporate or other legal status of an SD, Settling Non-Performing Owner, or Settling Non-Participating Party including, but not limited to, any transfer of assets or real or personal property, shall in no way alter such SD's, Settling Non-Performing Owner's or Settling Non-Participating Party's responsibilities under this CD.

3.      SDs shall provide a copy of this CD to each contractor hired to perform the Work and to each person representing either SD with respect to the Site or the Work, and shall condition all contracts entered into hereunder upon performance of the Work in conformity with the terms of this CD. SDs or their contractors shall provide written notice of the CD to all subcontractors hired to perform any portion of the Work. SDs shall nonetheless be responsible for ensuring that their contractors and subcontractors perform the Work in accordance with the terms of this CD. With regard to the activities undertaken pursuant to this CD, each contractor and subcontractor shall be deemed to be in a contractual relationship with SDs within the meaning of Section 107(b)(3) of CERCLA, 42 U.S.C. § 9607(b)(3).

## IV.    DEFINITIONS

4.      Unless otherwise expressly provided in this CD, terms used in this CD that are defined in CERCLA or in regulations promulgated under CERCLA shall have the meaning assigned to them in CERCLA or in such regulations. Whenever terms listed below are used in this CD or its appendices, the following definitions shall apply solely for purposes of this CD:

a.      "Affected Property" shall mean all real property at Sites O, Q, R, and S of Sauget Area 2 and any other real property where EPA determines, at any time, that access, land, water, or other resource use restrictions, and/or Institutional Controls are needed to

8

implement the Remedial Action, including, but not limited to, the properties on which Sites O, Q, R, and S are located.

b. "CERCLA" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601-9675.

c. "Consent Decree" or "CD" shall mean this Consent Decree and all appendices attached hereto (listed in Section XXIII). In the event of a conflict between this Consent Decree and any appendix, this Consent Decree shall control.

d. "Day" or "day" shall mean a calendar day. In computing any period of time under this Consent Decree, where the last day would fall on a Saturday, Sunday, or federal or State holiday, the period shall run until the close of business of the next working day.

e. "DOJ" shall mean the United States Department of Justice and its successor departments, agencies, or instrumentalities.

f. "Effective Date" shall mean the date upon which the approval of this CD is recorded on the Court's docket.

g. "EPA" shall mean the United States Environmental Protection Agency and its successor departments, agencies, or instrumentalities.

h. "EPA Hazardous Substance Superfund" shall mean the Hazardous Substance Superfund established by the Internal Revenue Code, 26 U.S.C. § 9507.

i. "Future Oversight Costs" shall mean that portion of Future Response Costs that EPA incurs in monitoring and supervising SDs' performance of the Work to determine whether such performance is consistent with the requirements of this CD, including

9

costs incurred in reviewing deliverables submitted pursuant to this CD, as well as costs incurred in overseeing implementation of the Work; however, Future Oversight Costs do not include, *inter alia*: the costs incurred by the United States pursuant to ¶ 11 (Emergencies and Releases), Section VII (Remedy Review), Section VIII (Property Requirements), and ¶ 25 (Access to Financial Assurance by EPA), or the costs incurred by the United States in enforcing this CD, including all costs incurred pursuant to Section XIV (Dispute Resolution), and all litigation costs.

        j.     "Future Response Costs" shall mean all costs, including, but not limited to, direct and indirect costs, that the United States incurs in reviewing or developing deliverables submitted pursuant to this Consent Decree, in overseeing implementation of the Work, or otherwise implementing, overseeing, or enforcing this CD, including, but not limited to, payroll costs, contractor costs, travel costs, laboratory costs, the costs incurred pursuant to ¶ 11 (Emergencies and Releases), ¶ 12 (Community Involvement) (including the costs of any technical assistance grant under Section 117(e) of CERCLA, 42 U.S.C. § 9617(e)), ¶ 26 (Access to Financial Assurance by SDs), Section VII (Remedy Review), Section VIII (Property Requirements) (including the cost of attorney time and any monies paid to secure or enforce access or land, water, or other resource use restrictions and/or to secure, implement, monitor, maintain, or enforce Institutional Controls including the amount of just compensation), and Section XIV (Dispute Resolution), and all litigation costs. Future Response Costs shall also include all Interim Response Costs, and all Interest on those Past Response Costs SDs have agreed to pay pursuant to Section X of this CD that has accrued pursuant to 42 U.S.C. § 9607(a) during the period from May 1, 2019 to the Effective Date.

k.      "IEPA" shall mean the Illinois Environmental Protection Agency and any successor departments or agencies of the State.

l.      "Institutional Controls" shall mean Proprietary Controls and state or local laws, regulations, ordinances, zoning restrictions, or other governmental controls or notices that: (a) limit land, water, or other resource use to minimize the potential for human exposure to Waste Material at or in connection with the Site; (b) limit land, water, or other resource use to implement, ensure non-interference with, or ensure the protectiveness of the Remedial Action; and/or (c) provide information intended to modify or guide human behavior at or in connection with the Site.

m.      "Institutional Control Implementation and Assurance Plan" or "ICIAP" shall mean the plan for implementing, maintaining, monitoring, and reporting on the Institutional Controls set forth in the ROD, prepared in accordance with the Statement of Work ("SOW").

n.      "Interim Response Costs" shall mean all costs, including, but not limited to, direct and indirect costs, (a) paid by the United States in connection with OU 1 of Sauget Area 2 between May 1, 2019 and the Effective Date, or (b) incurred prior to the Effective Date but paid after that date.

o.      "Interest" shall mean interest at the rate specified for interest on investments of the EPA Hazardous Substance Superfund, compounded annually on October 1 of each year, in accordance with 42 U.S.C. § 9607(a). The applicable rate of interest shall be the rate in effect at the time the interest accrues. The rate of interest is subject to change on October 1 of each year. Rates are available online at http://www.epa.gov/superfund/superfund-interest-rates rates.

11

p.      "Interest Earned" shall mean interest earned on amounts in the Sauget

Area 2 Remediation Account from the date funds in excess of $2.5 million are transferred

pursuant to Paragraph 34 and continuing until disbursement pursuant to Paragraph 36.

Interest shall be computed monthly at a rate based on the annual return on investments of the

EPA Hazardous Substance Superfund. The applicable rate of interest shall be the rate in

effect at the time the interest accrues.

q.      "Municipal Solid Waste" or "MSW" shall mean waste material:

(a) generated by a household (including a single or multifamily residence); or (b) generated

by a commercial, industrial, or institutional entity, to the extent that the waste material (1) is

essentially the same as waste normally generated by a household; (2) is collected and

disposed of with other municipal solid waste as part of normal municipal solid waste

collection services; and (3) contains a relative quantity of hazardous substances no greater

than the relative quantity of hazardous substances contained in waste material generated by a

typical single-family household.

r.      "National Contingency Plan" or "NCP" shall mean the National Oil and

Hazardous Substances Pollution Contingency Plan promulgated pursuant to Section 105 of

CERCLA, 42 U.S.C. § 9605, codified at 40 C.F.R. Part 300, and any amendments thereto.

s.      "Non-Settling Owner" shall mean any person, other than an SD, that owns

or controls any Affected Property. The clause "Non-Settling Owner's Affected Property" means

Affected Property owned or controlled by Non-Settling Owner.

t.      "Operable Unit 1" or "OU 1" consists of the soil, sediments, and surface

water, as well as the groundwater contamination source areas, at the Sauget Area 2 Site, as

12

defined in subparagraph 4.ff. of this CD. Operable Unit 1 does not include groundwater contamination or Sauget Area 1.

u.      "Operation and Maintenance" or "O&M" shall mean all activities required to operate, maintain, and monitor the effectiveness of the Remedial Action as specified in the SOW or any EPA-approved O&M Plan.

v.      "Owner SD" shall mean any SD that owns or controls any Affected Property, including Solutia. The clause "Owner SD's Affected Property" means Affected Property owned or controlled by the Owner SD.

w.      "Paragraph" or "¶" shall mean a portion of this CD identified by an Arabic numeral or an upper or lower case letter.

x.      "Parties" shall mean the United States, SDs, Settling Non-Performing Owners, and Settling Non-Participating Parties.

y.      "Past Response Costs" shall mean all costs, including, but not limited to, direct and indirect costs, that the United States paid at or in connection with the Site through April 30, 2019, plus Interest on all such costs that has accrued pursuant to 42 U.S.C. § 9607(a) through such date.

z.      "Performance Standards" shall mean the cleanup standards and other measures of achievement of the Remedial Action Objectives, as set forth in the ROD and the SOW and any modified standards established pursuant to this CD.

aa.     "Proprietary Controls" shall mean easements or covenants running with the land that (a) limit land, water, or other resource use and/or provide access rights and (b) are created pursuant to common law or statutory law by an instrument that is recorded in the appropriate land records office.

13

bb.     "RCRA" shall mean the Solid Waste Disposal Act, <u>42 U.S.C.</u> <u>§§ 6901-</u> 6992 (also known as the Resource Conservation and Recovery Act).

cc.     "Record of Decision" or "ROD" shall mean the EPA Record of Decision relating to OU 1 at the Sauget Area 2 Site signed on December 16, 2013, by the Director of the Superfund Division, EPA Region 5, and all attachments thereto. The ROD is attached as Appendix C.

dd.     "Remedial Action" or "RA" shall mean the remedial action selected in the ROD.

ee.     "Remedial Design" or "RD" shall mean those activities to be undertaken by SDs to develop final plans and specifications for the RA as stated in the SOW.

ff.     "Site" or "Sauget Area 2 Site" means the geographic area so named and identified by EPA, located within the corporate limits of the Village of Sauget, Illinois and extending into the adjoining Village of Cahokia, Illinois, and depicted generally on the map attached hereto as Appendix B. It includes the areas described in subparagraphs 4.ff(1) through (5) of this CD as well as the areal extent of contamination in soils, sediment, surface water and groundwater released therefrom, except that, for the purposes of this CD, the Sauget Area 2 Site does not include groundwater and does not include the Sauget Area 1 Site, or soils, sediments, surface water, or groundwater of the Sauget Area 1 Site. Specifically, the Sauget Area 2 Site contains the following source areas:

(1)     <u>"Site O,"</u> depicted generally on the map attached hereto as Appendix B, is located on Mobile Avenue in Sauget, Illinois, and occupies approximately 28 acres of land to the northeast of the ABRTF. Site O consists of four inactive sludge dewatering lagoons associated with the old Village of

14

Sauget Physical/Chemical Wastewater Treatment Plant ("P/C plant") and two adjacent areas where wastes came to be located.

(2)     **"Site P,"** depicted generally on the map attached hereto as Appendix B, is located between the Illinois Central Gulf Railroad and the Terminal Railroad north of Monsanto Avenue in the Village of Sauget. Site P is a former licensed solid waste landfill that occupies approximately 32 acres of land.

(3)     "Site Q," depicted generally on the map attached hereto as Appendix B, is located in the Villages of Sauget and Cahokia, Illinois, and is bordered by Sauget Site R and the old Union Electric Power Plant on the north; the Illinois Central Gulf Railroad and the United States Army Corps of Engineers flood control levee on the east; and the Mississippi River on the west. Due to its large size and varied disposal history, Site Q was divided into four sections based on the nature and extent of contamination and the anticipated remedial actions to be undertaken there: Site Q Dogleg, Site Q North, Site Q Central, and Site Q South.

      i.     Site Q Dogleg:  The northern portion of Site Q and due east of Site R, bounded on the north and south by extensions of the Site R north and south boundaries.

      ii.     Site Q North: The northern portion of Site Q minus Site Q Dogleg. Q North and Q Dogleg together occupy approximately 52 acres.

15

        iii.      <u>Site Q Central:</u> The central portion of Site

Q, approximately 67 acres.

        iv.      <u>Site Q South:</u> This portion of Site Q is south of the Alton

& Southern Railroad, and is approximately 87 acres in size.

    (4)     <u>"Site R,"</u> depicted generally on the map attached hereto as

Appendix B, is located on the river side of the flood control levee immediately

adjacent to the Mississippi River in Sauget, Illinois and just north and west of

parts of Site Q. Site R was operated for 20 years as Monsanto's chemical

waste landfill. Site R is alternately known as the

"Sauget Toxic Dump," "Monsanto Landfill," and the "River's Edge Landfill."

    (5)     <u>"Site S,"</u> depicted generally on the map attached hereto as

Appendix B, is located in the Village of Sauget and is approximately 1 acre in

size. The site is situated to the west-southwest of Site O and to the west of and

in close proximity to the old Clayton Chemical solvent recycling facility.

    gg.    "Sauget Area 2 Remediation Account" shall mean the special account

with that name established by EPA within the Hazardous Substance Superfund pursuant to

Paragraph 9.b. of the consent decree entered on December 15, 2009, in *United States v.*

*Pharmacia Corp., et al.*, Civil Action No. 99-063 (S.D. Ill.).

    hh.    "Sauget Area 2 Site Special Account" shall mean the special account,

within the EPA Hazardous Substance Superfund, established for the Site by EPA pursuant to

Section 122(b)(3) of CERCLA, <u>42 U.S.C. § 9622(b)(3)</u>, and in the consent decree entered in

the United States District Court for the Southern District of Illinois on January 30, 2007, in

*United States v. Afton Chem. Co., et al.,* Case No. 3:06-cv- 00763.

16

ii.    "Section" shall mean a portion of this Consent Decree identified by a Roman numeral.

jj.    "Settling Defendants" or "SDs" shall mean Solutia and Pharmacia and their successors and assigns.

kk.    "Settling Non-Participating Parties" (also referred to in signature pages included in Exhibit E as "Settling Non-Participating Defendants" although these parties are not named defendants) shall mean those Parties identified in Appendix A whose signatures on this Decree are enclosed in Appendix E and their successors and assigns.

ll.    "Settling Non-Performing Owners" shall mean Eagle Marine and the Village of Sauget and their heirs, successors and assigns. The phrase "Settling Non-Performing Owner's Affected Property" means Affected Property owned or controlled by a Settling Non-Performing Owner.

mm.    "State" shall mean the State of Illinois.

nn.    "Statement of Work" or "SOW" shall mean the document describing the activities SDs must perform to implement the RD, the RA, and O&M regarding the Site, which is attached as Appendix D to this CD and any modifications made in accordance with this CD.

oo.    "Supervising Contractors" shall mean the principal contractors retained by SDs to supervise and direct the implementation of the Work under this CD.

pp.    "Transfer" shall mean to sell, assign, convey, lease, mortgage, or grant a security interest in, or where used as a noun, a sale, assignment, conveyance, or other disposition of any interest by operation of law or otherwise.

qq.    "United States" shall mean the United States of America and each

17

department, agency, and instrumentality of the United States, including EPA.

       rr.     "Waste Material" shall mean (1) any "hazardous substance" under Section 101(14) of CERCLA, 42 U.S.C. § 9601(14); (2) any pollutant or contaminant under Section 101(33) of CERCLA, 42 U.S.C. § 9601(33); and (3) any "solid waste" under Section 1004(27) of RCRA, 42 U.S.C. § 6903(27).

       ss.     "Work" shall mean all activities and obligations SDs are required to perform under this CD, except the activities required under Section XX (Retention of Records).

# V.      GENERAL PROVISIONS

    5.     **Objectives of the Parties**. The objectives of the Parties in entering into this CD are to protect public health or welfare or the environment by the design and implementation of response actions at the Site by SDs, to pay response costs of the United States, and to resolve the claims of the United States against SDs, Settling Non-Performing Owners, and Settling Non-Participating Parties as provided in this CD. This CD does not terminate the 2002 UAO, EPA Docket No. V-W-02-C-716, which continues in full force and effect.

    6.     **Commitments by SDs**

       a.     SDs shall finance and perform the Work in accordance with this CD and all deliverables developed by SDs and approved or modified by EPA pursuant to this CD. SDs shall pay the United States for its response costs as provided in this CD.

       b.     SDs' obligations to finance and perform the Work, including obligations to pay amounts due under this CD, are joint and several. In the event of the insolvency of either SD or the failure by either SD to implement any requirement of this CD, the remaining SD shall

18

complete all such requirements. In the event of the insolvency of either SD or the failure by either SD to implement any requirement of this CD, EPA shall be entitled and obligated to access such SD's Financial Assurance under Section IX (Financial Assurance) and shall make such funds available to the remaining SD to facilitate the completion of the Work as provided in Paragraph 26 and the remaining SD shall complete all such requirements.

7.     **Compliance with Applicable Law**. Nothing in this CD limits SDs' obligations to comply with the requirements of all applicable federal and state laws and regulations. SDs must also comply with all applicable or relevant and appropriate requirements of all federal and state environmental laws as set forth in the ROD and the SOW. The activities conducted pursuant to this CD, if approved by EPA, shall be deemed to be consistent with the NCP as provided in Section 300.700(c)(3)(ii) of the NCP.

8.     **Permits**

a.     As provided in Section 121(e) of CERCLA, 42 U.S.C. § 9621(e), and Section 300.400(e) of the NCP, no permit shall be required for any portion of the Work conducted entirely on-site (*i.e.,* within the areal extent of contamination or in very close proximity to the contamination and necessary for implementation of the Work). Where any portion of the Work that is not on-site requires a federal or state permit or approval, SDs shall submit timely and complete applications and take all other actions necessary to obtain all such permits or approvals.

b.     SDs may seek relief under the provisions of Section XIII (Force Majeure) for any delay in the performance of the Work resulting from a failure to obtain, or a delay in obtaining, any permit or approval referenced in ¶ 8.a and required for the Work,

19

provided that they have submitted timely and complete applications and taken all other actions necessary to obtain all such permits or approvals.

      c.     This CD is not, and shall not be construed to be, a permit issued pursuant to any federal or state statute or regulation.

## VI.    PERFORMANCE OF THE WORK

9.    **Coordination and Supervision**

    a.    **Project Coordinators**

    (1)    SDs' Project Coordinator must have sufficient technical expertise to coordinate the Work. SDs' Project Coordinator may not be an attorney representing either SD in this matter and may not act as the Supervising Contractor. SDs' Project Coordinator may assign other representatives, including other contractors, to assist in coordinating the Work.

    (2)    EPA shall designate and notify the SDs of EPA's Project Coordinator and Alternate Project Coordinator. EPA may designate other representatives, which may include its employees, contractors and/or consultants, to oversee the Work. EPA's Project Coordinator/Alternate Project Coordinator will have the same authority as a remedial project manager and/or an on-scene coordinator, as described in the NCP. This includes the authority to halt the Work and/or to conduct or direct any necessary response action when he or she determines that conditions at the Site constitute an emergency or may present an immediate threat to public health or welfare or the environment due to a release or threatened release of Waste Material.

(3)     SDs' Project Coordinator shall meet with EPA's Project Coordinator at least monthly unless EPA determines that less frequent meetings are appropriate.

b.      **Supervising Contractor**. SDs' proposed Supervising Contractor must have sufficient technical expertise to supervise the Work and a quality assurance system that complies with ANSI/ASQC E4-2004, Quality Systems for Environmental Data and Technology Programs: Requirements with Guidance for Use (American National Standard).

c.      **Procedures for Disapproval/Notice to Proceed**

(1)     SDs shall designate, and notify EPA, within 10 days after the Effective Date, of the name, title, contact information, and qualifications of the SDs' proposed Project Coordinator and Supervising Contractor, whose qualifications shall be subject to EPA's review for verification based on objective assessment criteria (*e.g.,* experience, capacity, technical expertise) and do not have a conflict of interest with respect to the project.

(2)     EPA shall issue notices of disapproval and/or authorizations to proceed regarding the proposed Project Coordinator and Supervising Contractor, as applicable. If EPA issues a notice of disapproval, SDs shall, within 30 days, submit to EPA a list of supplemental proposed Project Coordinators and/or Supervising Contractors, as applicable, including a description of the qualifications of each. EPA shall issue a notice of disapproval or authorization to proceed regarding each supplemental proposed coordinator and/or contractor. SDs may select any coordinator/contractor covered by an authorization to proceed and shall, within 21 days, notify EPA of SDs' selection.

21

(3)      SDs may change their Project Coordinator and/or Supervising Contractor, as applicable, by following the procedures of ¶¶ 9.c(1) and 9.c(2).

(4)      Notwithstanding the procedures of ¶¶ 9.c(1) through 9.c(3), SDs have proposed, and EPA has authorized SDs to proceed, regarding the following Project Coordinator and Supervising Contractor: William Johnson is accepted by EPA as the Project Coordinator and Golder & Associates is accepted by EPA as the Supervising Contractor.

10.      **Performance of Work in Accordance with the SOW**. SDs shall: (a) develop the RD; (b) perform the RA; and (c) operate, maintain, and monitor the effectiveness of the RA, all in accordance with the SOW and all EPA-approved, conditionally-approved, or modified deliverables as required by the CD or the SOW. All deliverables required to be submitted for approval under the CD or SOW shall be subject to approval by EPA in accordance with ¶ 6.6 (Approval of Deliverables) of the SOW.

11.      **Emergencies and Releases**. SDs shall comply with the emergency and release response and reporting requirements under ¶ 4.3 (Emergency Response and Reporting) of the SOW. Subject to Section XVI (Covenants by the United States), nothing in this CD, including ¶ 4.3 of the SOW, limits any authority of Plaintiff: (a) to take all appropriate action to protect human health and the environment or to prevent, abate, respond to, or minimize an actual or threatened release of Waste Material on, at, or from the Site, or (b) to direct or order such action, or seek an order from the Court, to protect human health and the environment or to prevent, abate, respond to, or minimize an actual or threatened release of Waste Material

22

on, at, or from the Site. If, due to SDs' failure to take appropriate response action under ¶ 4.3 of the SOW, EPA takes such action instead, SDs shall reimburse EPA under Section X (Payments for Response Costs) for all costs of the response action.

12. **Community Involvement**. If requested by EPA, SDs shall conduct community involvement activities under EPA's oversight as provided for in, and in accordance with, Section 2 (Community Involvement) of the SOW. Such activities may include, but are not limited to, designation of a Community Involvement Coordinator and implementation of a technical assistance plan. Costs incurred by the United States under this Section constitute Future Response Costs to be reimbursed under Section X (Payments for Response Costs).

13. **Modification of SOW or Related Deliverables**

a. If EPA determines that it is necessary to modify the Work specified in the SOW and/or in deliverables developed under the SOW in order to achieve and/or maintain the Performance Standards or to carry out and maintain the effectiveness of the RA, and such modification is consistent with the Scope of the Remedy set forth in ¶ 1.3 of the SOW, then EPA may notify SDs of such modification. If SDs object to the modification they may, within 30 days after EPA's notification, seek dispute resolution under Section XIV.

b. The SOW and/or related work plans shall be modified: (1) in accordance with the modification issued by EPA; or (2) if SDs invoke dispute resolution, in accordance with the final resolution of the dispute. The modification shall be incorporated into and enforceable under this CD, and SDs shall implement all Work required by such modification. SDs shall incorporate the modification into the deliverable required under the SOW, as appropriate.

23

     c.     Nothing in this Paragraph shall be construed to limit EPA's authority to require performance of further response actions as otherwise provided in this CD.

14.     Nothing in this CD, the SOW, or any deliverable required under the SOW constitutes a warranty or representation of any kind by the United States that compliance with the Work requirements set forth in the SOW or related deliverable will achieve the Performance Standards.

## VII.    REMEDY REVIEW

15.     **Periodic Review**. SDs shall conduct, in accordance with ¶ 4.6 (Periodic Review Support Plan) of the SOW, studies and investigations to support EPA's reviews under Section 121(c) of CERCLA, 42 U.S.C. § 9621(c), and applicable regulations, of whether the RA is protective of human health and the environment.

## VIII.    PROPERTY REQUIREMENTS

16.     **Agreements Regarding Access and Non-Interference.** SDs shall, with respect to any Non-Settling Owner's Affected Property, use best efforts to secure from such Non-Settling Owner an agreement, enforceable by SDs and by Plaintiff, providing that such Non-Settling Owner shall, and Owner SD and Settling Non-Performing Owners, with respect to Owner SD's and Settling Non-Performing Owners' Affected Property, shall: (i) provide Plaintiff and the other SDs, and their representatives, contractors, and subcontractors with access at all reasonable times to such Affected Property to conduct any activity regarding the CD, including those listed in ¶ 16.a (Access Requirements); and (ii) refrain from using such Affected Property in any manner that EPA determines will pose an unacceptable risk to human health or to the

environment due to exposure to Waste Material, or interfere with or adversely affect the implementation, integrity, or protectiveness of the RA, including the restrictions listed in ¶ 16.b (Land, Water, or Other Resource Use Restrictions). SDs shall provide a copy of such access and use restriction agreement(s) to EPA.

    a.    **Access Requirements**. The following is a list of activities for which access is required regarding the Affected Property:

    (1)    Monitoring the Work;

    (2)    Verifying any data or information submitted to the United States;

    (3)    Conducting investigations regarding contamination at or near the Site;

    (4)    Obtaining samples;

    (5)    Assessing the need for, planning, or implementing additional response actions at or near the Site;

    (6)    Assessing the implementation of quality assurance and quality control practices as defined in the approved construction quality assurance quality control plan as provided in the SOW;

    (7)    Implementing the Work pursuant to the conditions set forth in ¶ 72 (Work Takeover);

    (8)    Inspecting and copying records, operating logs, contracts, or other documents maintained or generated by SDs or their agents, consistent with Section XIX (Access to Information);

    (9)    Assessing SDs' compliance with the CD;

25

(10)     Determining whether the Affected Property is being used in a manner that is prohibited or restricted, or that may need to be prohibited or restricted under the CD; and

(11)     Implementing, monitoring, maintaining, reporting on, and enforcing any land, water, or other resource use restrictions and Institutional Controls.

b.     **Land, Water, or Other Resource Use Restrictions**. The following is a list of land, water, or other resource use restrictions applicable to the Affected Property:

(1)     Prohibiting the following activities that could interfere with the RA: digging in, through or otherwise disturbing caps and covers installed at Sites O, Q, R, or S without prior written notice to and approval by EPA that shall include, at a minimum, using appropriate protective equipment and requiring the repair of all caps and covers to original ROD specifications;

(2)     Prohibiting the use of contaminated groundwater;

(3)     Prohibiting the following activities that could result in exposure to contaminants in subsurface soils and groundwater: digging in, through or otherwise disturbing caps and covers installed at Sites O, Q, R, or S without prior written notice to and approval by EPA that shall include, at a minimum, using appropriate protective equipment and requiring the repair of all caps and covers to original ROD specifications;

(4)     Ensuring that any new structures on the Site will not be constructed in the following manner which could interfere with the RA: constructing a structure that covers or otherwise interferes with Work; and

26

(5)    Ensuring that any new structures on the Site will be constructed in a manner that will minimize the potential risk of inhalation of contaminants.

17.    **Best Efforts**. As used in this Section, "best efforts" means the efforts that a reasonable person in the position of SDs would use so as to achieve the goal in a timely manner, including the cost of employing professional assistance and the payment of reasonable sums of money to secure access and/or use restriction agreements. If SDs are unable to accomplish what is required through "best efforts" in a timely manner, they shall notify the United States, and include a description of the steps taken to comply with the requirements. If the United States deems it appropriate, it may assist SDs, or take independent action, in obtaining such access and/or use restrictions. All costs incurred by the United States in providing such assistance or taking such action, including the cost of attorney time and the amount of monetary consideration or just compensation paid, constitute Future Response Costs to be reimbursed under Section X (Payments for Response Costs).

18.    If EPA determines in a decision document prepared in accordance with the NCP that Institutional Controls in the form of state or local laws, regulations, ordinances, zoning restrictions, or other governmental controls or notices are needed, SDs shall cooperate with EPA's efforts to secure and ensure compliance with such Institutional Controls.

19.    SDs, Owner SD, or Settling Non-Performing Owners shall not Transfer their Affected Property without first securing EPA's approval of, and transferee's consent to, an agreement that: (i) is enforceable by SDs, Owner SD, and Settling Non-Performing Owners and the United States; and (ii) requires the transferee to provide access to and to refrain from using the Affected Property to the same extent as is provided in ¶ 16.

20.     In the event of any Transfer of the Affected Property, unless the United States otherwise consents in writing, SDs, Owner SD, and Settling Non-Performing Owners shall continue to comply with their obligations under the CD, including their obligation to secure access and ensure compliance with any land, water, or other resource use restrictions regarding the Affected Property.

21.     Notwithstanding any provision of the CD, Plaintiff retains all of its access authorities and rights, as well as all of its rights to require land, water, or other resource use restrictions and Institutional Controls, including enforcement authorities related thereto, under CERCLA, RCRA, and any other applicable statute or regulation.

## IX.     FINANCIAL ASSURANCE

22.     In order to ensure completion of the Work, SDs shall secure financial assurance, initially in the amount of $15.5 million ("Estimated Cost of the Work"), for the benefit of EPA. The financial assurance must be one or more of the mechanisms listed below, in a form substantially identical to the relevant sample documents available from EPA or under the "Financial Assurance - Settlements" category on the Cleanup Enforcement Model Language and Sample Documents Database at http://cfpub.epa.gov/compliance/models/, and satisfactory to EPA. SDs may use multiple mechanisms if they are limited to surety bonds guaranteeing payment, letters of credit, and/or trust funds.

a.     A surety bond guaranteeing payment and/or performance of the Work that is issued by a surety company among those listed as acceptable sureties on federal bonds as set forth in Circular 570 of the U.S. Department of the Treasury;

b.      An irrevocable letter of credit, payable to or at the direction of EPA, that is issued by an entity that has the authority to issue letters of credit and whose letter-of-credit operations are regulated and examined by a federal or state agency; or

c.      A trust fund established for the benefit of EPA that is administered by a trustee that has the authority to act as a trustee and whose trust operations are regulated and examined by a federal or state agency.

23.      SDs have selected, and EPA has found satisfactory, as an initial form of financial assurance, a letter of credit from Solutia prepared in accordance with ¶ 22 in the amount of the Estimated Cost of the Work above. Within 30 days after the Effective Date, SDs shall secure all executed and/or otherwise finalized mechanisms or other documents consistent with the EPA-approved form of financial assurance and shall submit such mechanisms and documents to the Regional Financial Management Officer, to the United States, and to EPA as specified in Section XXI (Notices and Submissions).

24.      SDs shall diligently monitor the adequacy of the financial assurance. If either SD becomes aware of any information indicating that the financial assurance provided under this Section is inadequate or otherwise no longer satisfies the requirements of this Section, such SD shall notify EPA of such information within 7 days. If EPA determines that the financial assurance provided under this Section is inadequate or otherwise no longer satisfies the requirements of this Section, EPA will notify the affected SD of such determination. SDs shall, within 30 days after notifying EPA or receiving notice from EPA under this Paragraph, secure and submit to EPA for approval a proposal for a revised or alternative financial assurance mechanism that satisfies the requirements of this Section. EPA may extend this deadline for such time as is reasonably necessary for the affected SD, in the exercise of due diligence, to secure

and submit to EPA a proposal for a revised or alternative financial assurance mechanism, not to exceed 60 days. SDs shall follow the procedures of ¶ 27 (Modification of Amount, Form, or Terms of Financial Assurance) in seeking approval of, and submitting documentation for, the revised or alternative financial assurance mechanism. SDs' inability to secure financial assurance in accordance with this Section does not excuse performance of any other obligation under this Settlement.

25.     **Access to Financial Assurance by EPA**

a.      If EPA issues a notice of implementation of a Work Takeover under ¶ 72.b, then, in accordance with any applicable financial assurance mechanism, EPA is entitled to: (1) the performance of the Work; and/or (2) require that any funds guaranteed be paid in accordance with ¶ 25.d.

b.      If EPA is notified by the issuer of a financial assurance mechanism that it intends to cancel the mechanism, and the affected SD fails to provide an alternative financial assurance mechanism in accordance with this Section at least 30 days prior to the cancellation date, the funds guaranteed under such mechanism must be paid prior to cancellation in accordance with ¶ 25.d.

c.      If, upon issuance of a notice of implementation of a Work Takeover under ¶ 72.b, either: (1) EPA is unable for any reason to secure promptly the resources guaranteed under any applicable financial assurance mechanism, whether in cash or in-kind, to continue and complete the Work; or (2) the financial assurance is a demonstration or guarantee under ¶ 25.b, then EPA is entitled to demand an amount, as determined by EPA, sufficient to cover the cost of the remaining Work to be performed. SDs shall, within 30 days of such demand, pay the amount demanded as directed by EPA.

      d.     Any amounts required to be paid under this ¶ 25 shall be, as directed by EPA: (i) paid to EPA in order to facilitate the completion of the Work by EPA or by another person; or (ii) deposited into an interest-bearing account, established at a duly chartered bank or trust company that is insured by the FDIC, in order to facilitate the completion of the Work by another person. If payment is made to EPA, EPA may deposit the payment into the EPA Hazardous Substance Superfund or into the Sauget Area 2 Special Account within the EPA Hazardous Substance Superfund to be retained and used to conduct or finance response actions at or in connection with the Site, or to be transferred by EPA to the EPA Hazardous Substance Superfund.

      e.     All EPA Work Takeover costs not paid under this ¶ 25 must be reimbursed as Future Response Costs under Section X (Payments for Response Costs).

     26.     **Access to Financial Assurance by SDs.** In the event of the insolvency of either SD or the failure by either SD to implement any requirement of this Consent Decree in the absence of a Work Takeover, then, in accordance with any applicable financial assurance mechanism, EPA shall require that any funds guaranteed be paid will be deposited into a Special Account established for Sauget Area 2 within the EPA Hazardous Substance Superfund to be retained and used to conduct or finance response actions at or in connection with Sauget Area 2 Sites O, Q, R, or S, or to be transferred by EPA to the EPA Hazardous Substance Superfund. EPA shall disburse such funds from the Sauget Area 2 Special Account to any qualifying SD completing the Work at Sites O, Q, R, or S on a periodic basis after receipt of adequate documentation as necessary to compensate for its costs incurred in completing the Work. At the

same time, the remaining SD shall increase the amount of its Financial Assurance under

Paragraph 24 in order to total the estimated cost of the Work remaining at that time.

27. **Modification of Amount, Form, or Terms of Financial Assurance**. SDs may

submit, on any anniversary of the Effective Date or at any other time agreed to by the Parties, a

request to reduce the amount, or change the form or terms, of the financial assurance

mechanism. Any such request must be submitted to EPA in accordance with ¶ 24, and must

include an estimate of the cost of the remaining Work, an explanation of the bases for the cost

calculation, and a description of the proposed changes, if any, to the form or terms of the

financial assurance. EPA will notify SDs of its decision to approve or disapprove a requested

reduction or change pursuant to this Paragraph. SDs may reduce the amount of the financial

assurance mechanism only in accordance with: (a) EPA's approval; or (b) if there is a dispute,

the agreement, final administrative decision, or final judicial decision resolving such dispute

under Section XIV (Dispute Resolution). SDs may change the form or terms of the financial

assurance mechanism only in accordance with EPA's approval. Any decision made by EPA on a

request submitted under this Paragraph to change the form or terms of a financial assurance

mechanism shall not be subject to challenge by SDs pursuant to the dispute resolution provisions

of this CD or in any other forum. Within 30 days after receipt of EPA's approval of, or the

agreement or decision resolving a dispute relating to, the requested modifications pursuant to

this Paragraph, SDs shall submit to EPA documentation of the reduced, revised, or alternative

financial assurance mechanism in accordance with ¶ 23.

28. **Release, Cancellation, or Discontinuation of Financial Assurance**. SDs may

release, cancel, or discontinue any financial assurance provided under this Section only: (a) if

EPA issues the final Certification of Work Completion under ¶ 4.7 (Certification of Work

Completion for Each Specific Project) of the SOW; (b) in accordance with EPA's approval of such release, cancellation, or discontinuation; or (c) if there is a dispute regarding the release, cancellation or discontinuance of any financial assurance, in accordance with the agreement, final administrative decision, or final judicial decision resolving such dispute under Section XIV (Dispute Resolution).

## X.  PAYMENTS FOR RESPONSE COSTS

29.  **Payment by SDs for Past Response Costs**.

a.  Within 30 days after the Effective Date, SDs shall pay to EPA $700,000 in payment for Past Response Costs. Payment shall be made in accordance with ¶ 31.a (instructions for past response cost payments).

b.  **Deposit of Past Response Costs Payment**. The total amount to be paid by Setting Defendants pursuant to ¶ 29.a shall be deposited by EPA in the Sauget Area 2 Special Account to be retained and used to conduct or finance response actions at or in connection with the Site, or to be transferred by EPA to the EPA Hazardous Substance Superfund.

30.  **Payments by SDs for Future Response Costs**. SDs shall pay to EPA all Future Response Costs not inconsistent with the NCP, excluding the first $3,000,000 of Future Oversight Costs.

a.  **Periodic Bills**. On a periodic basis, EPA will send SDs a bill requiring payment that includes an Itemized Cost Summary, which includes direct and indirect costs incurred by EPA, its contractors, subcontractors, and DOJ. EPA will make reasonable efforts to send SDs this bill at least every 18 months. SDs shall make all payments within 45 days after

SDs' receipt of each bill requiring payment, except as otherwise provided in ¶ 32, in accordance with ¶ 31.b (instructions for future response cost payments).

      b.    **Deposit of Future Response Costs Payments**. The total amount to be paid by SDs pursuant to ¶ 30.a shall be deposited by EPA in the Sauget Area 2 Special Account to be retained and used to conduct or finance response actions at or in connection with Sites O, Q, R or S, or to be transferred by EPA to the EPA Hazardous Substance Superfund, provided, however, that EPA may deposit a Future Response Costs payment directly into the EPA Hazardous Substance Superfund if, at the time the payment is received, EPA estimates that the Sauget Area 2 Special Account balance is sufficient to address currently anticipated future response actions to be conducted or financed by EPA at or in connection with Sites O, Q, R, and S. Any decision by EPA to deposit a Future Response Costs payment directly into the EPA Hazardous Substance Superfund for this reason shall not be subject to challenge by SDs pursuant to the dispute resolution provisions of this CD or in any other forum.

31.    **Payment Instructions for SDs**

    a.    **Past Response Costs Payments and Future Response Costs Prepayments**.

        (1)    The Financial Litigation Unit (FLU) of the United States Attorney's Office for the Southern District of Illinois shall provide SDs, in accordance with ¶ 94, with instructions regarding making payments to DOJ on behalf of EPA. The instructions must include a Consolidated Debt Collection System ("CDCS") number to identify payments made under this CD.

(2)     For all payments subject to this ¶ 31.a, SDs shall make such payment by Fedwire Electronic Funds Transfer (EFT), http://www.pay.gov/, in accordance with the instructions provided under ¶ 31.a(1), and including references to the CDCS Number, Site/Spill ID Number 05XX, and DJ Number 90-11-2-06089/7.

(3)     For each payment made under this ¶ 31.a, SDs shall send notices, including references to the CDCS, Site/Spill ID, and DJ numbers, to the United States, EPA, and the EPA Cincinnati Finance Center, all in accordance with ¶ 94.

b.      **Future Response Costs Payments and Stipulated Penalties**

(1)     For all payments subject to this ¶ 31.b, SDs shall make such payment by Fedwire EFT, referencing the Site/Spill ID and DJ numbers. The Fedwire EFT payment must be sent as follows:

> Federal Reserve Bank of New York
> ABA = 021030004
> Account = 68010727
> SWIFT address = FRNYUS33
> 33 Liberty Street
> New York NY 10045
> Field Tag 4200 of the Fedwire message should read
> "D 68010727 Environmental Protection Agency"

(2)     For all payments made under this ¶ 31.b, SDs must include references to the Site/Spill ID and DJ numbers. At the time of any payment required to be made in accordance with ¶ 31.b, SDs shall send notices that payment has been made to the United States, EPA, and the EPA Cincinnati Finance Center, all in accordance with ¶ 94. All notices must include references

35

to the Site/Spill ID and DJ numbers.

32.     **Contesting Future Response Costs**. SDs may submit a Notice of Dispute,
initiating the procedures of Section XIV (Dispute Resolution), regarding any Future Response
Costs billed under ¶ 30 (Payments by SDs for Future Response Costs) if they determine that
EPA has made a mathematical error or included a cost item that is not within the definition of
Future Response Costs, or if they believe EPA incurred excess costs as a direct result of an EPA
action that was inconsistent with a specific provision or provisions of the NCP. Such Notice of
Dispute shall be submitted in writing within 30 days after receipt of the bill and must be sent to
the United States pursuant to Section XXI (Notices and Submissions). Such Notice of Dispute
shall specifically identify the contested Future Response Costs and the basis for objection. If SDs
submit a Notice of Dispute, SDs shall within the 45-day period, also as a requirement for
initiating the dispute, (a) pay all uncontested Future Response Costs to the United States, and
(b) establish, in a duly chartered bank or trust company, an interest-bearing escrow account that
is insured by the Federal Deposit Insurance Corporation (FDIC), and remit to that escrow
account funds equivalent to the amount of the contested Future Response Costs. SDs shall send
to the United States, as provided in Section XXI (Notices and Submissions), a copy of the
transmittal letter and check paying the uncontested Future Response Costs, and a copy of the
correspondence that establishes and funds the escrow account, including, but not limited to,
information containing the identity of the bank and bank account under which the escrow
account is established as well as a bank statement showing the initial balance of the escrow
account. If the United States prevails in the dispute, SDs shall pay the sums due (with accrued
interest) to the United States within 7 days after the resolution of the dispute. If SDs prevail
concerning any aspect of the contested costs, SDs shall pay that portion of the costs (plus

36

associated accrued interest) for which they did not prevail to the United States within 7 days after the resolution of the dispute. SDs shall be disbursed any balance of the escrow account. All payments to the United States under this Paragraph shall be made in accordance with ¶ 31.b (instructions for future response cost payments). The dispute resolution procedures set forth in this Paragraph in conjunction with the procedures set forth in Section XIV (Dispute Resolution) shall be the exclusive mechanisms for resolving disputes regarding SDs' obligation to reimburse the United States for its Future Response Costs.

33.     **Interest**. In the event that any payment for Past Response Costs or for Future Response Costs required under this Section is not made by the date required, SDs shall pay Interest on the unpaid balance. The Interest on Past Response Costs shall begin to accrue on the Effective Date. The Interest on Future Response Costs shall begin to accrue on the date of the bill. The Interest shall accrue through the date of SDs' payment. Payments of Interest made under this Paragraph shall be in addition to such other remedies or sanctions available to Plaintiff by virtue of SDs' failure to make timely payments under this Section including, but not limited to, payment of stipulated penalties pursuant to Section XV (Stipulated Penalties).

## XI.     DISBURSEMENT OF SPECIAL ACCOUNT FUNDS

34.     **Creation of Sauget Groundwater Remediation Account and Agreement to Disburse Funds to SDs**. Within 30 days of the Effective Date, EPA shall establish the Sauget Groundwater Remediation Account, a new special account within the EPA Hazardous Substance Superfund to be used to pay for future remediation at the Sauget Groundwater OU. Within 30 days of the Effective Date, EPA shall transfer all funds into the Sauget Groundwater Remediation Account from the Sauget Area 2 Remediation Account that are in excess of $2.5

37

million as of the date of the transfer. Thereafter, any funds from insurance proceeds that would have been deposited into the Sauget Area 2 Remediation Account pursuant to Paragraph 9(c) of the consent decree, entered on December 15, 2009, in *United States v. Pharmacia Corp., et al.,* Civil Action No. 99-063 (S.D. Ill.), shall be placed into the Sauget Groundwater Remediation Account.

      a.     Subject to the terms and conditions set forth in this Section XI, EPA agrees to make up to $2.5 million of the funds in the Sauget Area 2 Remediation Account, plus Interest Earned, available for disbursement to SDs as partial reimbursement for performance of the Work. EPA shall disburse funds from the Sauget Area 2 Remediation Account to SDs in accordance with the procedures and milestones for phased disbursement set forth in this Section.

      b.     Funds in the Sauget Groundwater Remediation Account may be used to address response actions at or in connection with the Site, or be transferred by EPA to the Hazardous Substance Superfund. These actions include the following: (i) address past unreimbursed response costs related to the Sauget Groundwater OU, (ii) to disburse funds to a party that has entered into an Administrative Settlement Agreement and Order on Consent with EPA and/or Consent Decree with the United States relating to the Sauget Groundwater OU as partial reimbursement for performance of response actions related to the Sauget Groundwater OU, (iii) response work for the Sauget Groundwater OU, or (iv) after completion of any response action at the Sauget Groundwater OU or after a Work Takeover under ¶ 72, to be transferred by EPA to the Sauget Area 2 Special Account within the EPA Hazardous Substance Superfund. EPA may provide the Settling Defendants with an accounting of the funds in the Sauget Groundwater Remediation Account, but EPA's accounting of and planned uses for the

38

funds in the Sauget Groundwater Remediation Account will not be subject to Section XIV (Dispute Resolution) of this Consent Decree.

35. **Timing, Amount, and Method of Disbursing Funds From the Sauget Area 2 Remediation Account**. Within 45 days after EPA's receipt of a Cost Summary and Certification, as defined by ¶ 36.b, or if EPA has requested additional information under ¶ 36.b or a revised Cost Summary and Certification under ¶ 36.c, within 45 days after receipt of the additional information or revised Cost Summary and Certification, and subject to the conditions set forth in this Section, EPA shall disburse the funds from the Sauget Area 2 Remediation Account upon completion of the following milestones (although not necessarily in the following order with respect to each Site), and in the following amounts:

| Milestone | Disbursement of Funds |
|---|---|
| EPA Notice to Proceed with RA Construction | $500,000 |
| EPA Notice of RA Construction Completion for Site O | $700,000 |
| EPA Notice of RA Construction Completion for Site Q | $950,000 |
| EPA Notice of RA Construction Completion for Site R | $225,000 |
| EPA Notice of RA Construction Completion for Site S | $125,000 |

After EPA issues its final written Certification of RA Completion and at the same time EPA makes its last disbursement pursuant to the milestones listed in the table above, EPA shall disburse all Interest Earned to SDs. EPA shall disburse the funds from the Sauget Area 2 Remediation Account to SDs pursuant to instructions provided by SDs in the Cost Summary and Certification.

36. **Requests for Disbursement of Special Account Funds**

a. Within 60 days after issuance of EPA's written confirmation that a milestone of the Work, as defined in ¶ 35 (Timing, Amount, and Method of Disbursing Funds From the Sauget Area 2 Remediation Account), has been satisfactorily completed, SDs shall

39

submit to EPA a Cost Summary and Certification, as defined in ¶ 36.b, covering the Work performed up to the date of completion of that milestone. SDs shall not include in any submission costs included in a previous Cost Summary and Certification following completion of an earlier milestone of the Work if those costs have been previously sought or reimbursed pursuant to ¶ 35.

        b.      Each Cost Summary and Certification shall include a complete and accurate written cost summary and certification of the necessary costs incurred and paid by SDs for the Work covered by the particular submission, excluding costs not eligible for disbursement under ¶ 37 (Costs Excluded from Disbursement). Each Cost Summary and Certification shall contain the following statement signed by the Chief Financial Officer of an SD:

> To the best of my knowledge, after thorough investigation and review of SDs' documentation of costs incurred and paid for Work performed pursuant to this CD [**insert, as appropriate**: "up to the date of completion of milestone 1," "between the date of completion of milestone 1 and the date of completion of milestone 2," or "between the date of completion of milestone 2 and the date of completion of the milestone 3," *etc.*] I certify that the information contained in or accompanying this submission is true, accurate, and complete. I am aware that there are significant penalties for knowingly submitting false information, including the possibility of fine and imprisonment.

The Chief Financial Officer of an SD shall also provide EPA a list of the documents that he or she reviewed in support of the Cost Summary and Certification. Upon request by EPA, SDs shall submit to EPA any additional information that EPA deems necessary for its review and approval of a Cost Summary and Certification.

        c.      If EPA finds that a Cost Summary and Certification includes a mathematical error, costs excluded under ¶ 37 (Costs Excluded from Disbursement), costs that are inadequately documented, or costs submitted in a prior Cost Summary and Certification, it

will notify SDs and provide them an opportunity to cure the deficiency by submitting a

revised Cost Summary and Certification. If SDs fail to cure the deficiency within 30 days after

being notified of, and given the opportunity to cure, the deficiency, EPA will recalculate SDs'

costs eligible for disbursement for that submission and disburse the corrected amount to SDs

in accordance with the procedures in ¶ 35 (Timing, Amount, and Method of Disbursing Funds

from the Sauget Area 2 Remediation Account). SDs may dispute EPA's recalculation under

this Paragraph pursuant to Section XIV (Dispute Resolution). In no event shall SDs be

disbursed funds from the Sauget Area 2 Remediation Account in excess of amounts properly

documented in a Cost Summary and Certification accepted or modified by EPA.

37.     **Costs Excluded from Disbursement**. The following costs are excluded from, and

shall not be sought by SDs for, disbursement from the Sauget Area 2 Remediation Account:

(a) response costs paid pursuant to Section X (Payments for Response Costs); (b) any other

payments made by SDs to the United States pursuant to this CD, including, but not limited to, any

Interest or stipulated penalties paid pursuant to Section X (Payments for Response Costs) or XV

(Stipulated Penalties); (c) attorneys' fees and costs, except for reasonable attorneys' fees and

costs necessarily related to any Work under the SOW for which legal services are essential, such

as obtaining access or institutional controls as required by Section VIII (Property Requirements);

(d) costs of any response activities SDs perform that are not required under, or approved by EPA

pursuant to, this CD; (e) costs related to SDs' litigation, settlement, development of potential

contribution claims, or identification of defendants; (f) internal costs of SDs, including but not

limited to, salaries, travel, or in-kind services, except for those costs that represent the work of

employees of SDs directly performing the Work; (g) any costs incurred by SDs prior to the

Effective Date; or (h) any costs incurred by SDs pursuant to Section XIV (Dispute Resolution).

41

38.     **Termination of Disbursements from the Special Account**. EPA's obligation to disburse funds from the Sauget Area 2 Remediation Account under this CD shall terminate upon EPA's determination that SDs: (a) have knowingly submitted a materially false or misleading Cost Summary and Certification; (b) have submitted a materially inaccurate or incomplete Cost Summary and Certification, and have failed to correct the materially inaccurate or incomplete Cost Summary and Certification within 21 days after being notified of, and given the opportunity to cure, the deficiency; or (c) failed to submit a Cost Summary and Certification as required by ¶ 36 (Requests for Disbursement of Special Account Funds) within 60 days (or such longer period as EPA agrees) after being notified that EPA intends to terminate its obligation to make disbursements pursuant to this Section because of SDs' failure to submit the Cost Summary and Certification as required by ¶ 36. EPA's obligation to disburse funds from the Sauget Area 2 Remediation Account shall also terminate upon EPA's assumption of performance of any portion of the Work pursuant to ¶ 72 (Work Takeover), when such assumption of performance of the Work is not challenged by SDs or, if challenged, is upheld under Section XIV (Dispute Resolution). SDs may dispute EPA's termination of special account disbursements under Section XIV.

39.     **Recapture of Special Account Disbursements**. Upon termination of disbursements from the Sauget Area 2 Remediation Account under ¶ 38 (Termination of Disbursements from the Special Account), if EPA has previously disbursed funds from the Sauget Area 2 Remediation Account for activities specifically related to the reason for termination, *e.g.,* discovery of a materially false or misleading submission after disbursement of funds based on that submission, EPA shall submit a bill to SDs for those amounts already disbursed from the Sauget Area 2 Remediation Account specifically related to the reason for

42

termination, plus Interest on that amount covering the period from the date of disbursement of the funds by EPA to the date of repayment of the funds by SDs. Within 45 days after receipt of EPA's bill, SDs shall reimburse the EPA Hazardous Substance Superfund for the total amount billed. Payment shall be made in accordance with ¶ 31.b (instructions for future response cost payments). Upon receipt of payment, EPA may deposit all or any portion thereof in the Sauget Area 2 Special Account, the Sauget Area 2 Remediation Account, or the EPA Hazardous Substance Superfund. The determination of where to deposit or how to use the funds shall not be subject to challenge by SDs pursuant to the dispute resolution provisions of this CD or in any other forum. SDs may dispute EPA's determination as to recapture of funds pursuant to Section XIV (Dispute Resolution).

40. **Balance of Special Account Funds**. After EPA issues its final written Certification of RA Completion pursuant to this CD, and after EPA completes all disbursement to SDs in accordance with this Section, if any funds are in the Sauget Area 2 Remediation Account, EPA shall transfer any such funds to the Sauget Area 2 Groundwater Remediation Account. Nothing in this CD shall be interpreted to require EPA to obligate funds in excess of amounts currently available. In the event that EPA has assumed performance of any portion of the Work pursuant to ¶ 72 (Work Takeover), all future disbursements under this Section are canceled and any funds in the Sauget Area 2 Remediation Account shall be placed in the Sauget Area 2 Special Account.

## XII.   INDEMNIFICATION AND INSURANCE

41.   **SDs' Indemnification of the United States**

a.   The United States does not assume any liability by entering into this CD or by virtue of any designation of SDs as EPA's authorized representatives under Section 104(e) of CERCLA, 42 U.S.C. § 9604(e). SDs shall indemnify, save, and hold harmless the United States and its officials, agents, employees, contractors, subcontractors, and representatives for or from any and all claims or causes of action arising from, or on account of, negligent or other wrongful acts or omissions of SDs, their officers, directors, employees, agents, contractors, subcontractors, and any persons acting on SDs' behalf or under their control, in carrying out activities pursuant to this CD, including, but not limited to, any claims arising from any designation of SDs as EPA's authorized representatives under Section 104(e) of CERCLA. Further, SDs agree to pay the United States all costs it incurs including, but not limited to, attorneys' fees and other expenses of litigation and settlement arising from, or on account of, claims made against the United States based on negligent or other wrongful acts or omissions of SDs, their officers, directors, employees, agents, contractors, subcontractors, and any persons acting on their behalf or under their control, in carrying out activities pursuant to this CD. The United States shall not be held out as a party to any contract entered into by or on behalf of SDs in carrying out activities pursuant to this CD. Neither SD nor any such contractor shall be considered an agent of the United States.

b.   The United States shall give SDs notice of any claim for which the United States plans to seek indemnification pursuant to this ¶ 41, and shall consult with SDs prior to settling such claim.

44

42.     SDs covenant not to sue and agree not to assert any claims or causes of action against the United States for damages or reimbursement or for set-off of any payments made or to be made to the United States, arising from or on account of any contract, agreement, or arrangement between any one or more of SDs and any person for performance of Work on or relating to the Site, including, but not limited to, claims on account of construction delays. In addition, SDs shall indemnify, save and hold harmless the United States with respect to any and all claims for damages or reimbursement arising from or on account of any contract, agreement, or arrangement between any one or more of SDs and any person for performance of Work on or relating to the Site, including, but not limited to, claims on account of construction delays.

43.     **Insurance**. No later than 15 days before commencing any on-site Work, SDs shall secure, and shall maintain until the first anniversary after issuance of EPA's Certification of RA Completion pursuant to ¶ 4.8 (Certification of RA Completion) of the SOW commercial general liability insurance with limits of liability of $1 million per occurrence, automobile liability insurance with limits of liability of $1 million per accident, and umbrella liability insurance with limits of liability of $5 million in excess of the required commercial general liability and automobile liability limits, naming the United States as an additional insured with respect to all liability arising out of the activities performed by or on behalf of SDs pursuant to this CD. In addition, for the duration of this CD, SDs shall satisfy, or shall ensure that their contractors or subcontractors satisfy, all applicable laws and regulations regarding the provision of worker's compensation insurance for all persons performing the Work on behalf of SDs in furtherance of this CD. Prior to commencement of the Work, SDs shall provide to EPA certificates of such insurance and a copy of each insurance policy. SDs shall resubmit such certificates and copies of policies each year on the anniversary of the Effective Date, but need

45

only submit copies of coverage changes to each insurance policy. If SDs demonstrate by evidence satisfactory to EPA that any contractor or subcontractor maintains insurance equivalent to that described above, or insurance covering the same risks but in a lesser amount, then, with respect to that contractor or subcontractor, SDs need provide only that portion of the insurance described above that is not maintained by the contractor or subcontractor. SDs shall ensure that all submittals to EPA under this Paragraph identify the Sauget Area 2 Site in Sauget, St. Clair County, Illinois and the civil action number of this case.

## XIII.    FORCE MAJEURE

44.    "Force majeure," for purposes of this CD, is defined as any event arising from causes beyond the control of SDs, of any entity controlled by SDs, or of SDs' contractors that delays or prevents the performance of any obligation under this CD despite SDs' best efforts to fulfill the obligation. The requirement that SDs exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential force majeure and best efforts to address the effects of any potential force majeure (a) as it is occurring and (b) following the potential force majeure such that the delay and any adverse effects of the delay are minimized to the greatest extent possible. "Force majeure" does not include financial inability to complete the Work or a failure to achieve the Performance Standards.

45.    If any event occurs or has occurred that may delay the performance of any obligation under this CD for which SDs intend or may intend to assert a claim of force majeure, SDs shall notify EPA's Project Coordinator orally or, in his or her absence, EPA's Alternate Project Coordinator or, in the event both of EPA's designated representatives are unavailable, the Director of the Superfund Division, EPA Region 5, within 48 hours of when SDs first knew

that the event might cause a delay. Within ten (10) days thereafter, SDs shall provide in writing to EPA an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; SDs' rationale for attributing such delay to a force majeure; and a statement as to whether, in the opinion of SDs, such event may cause or contribute to an endangerment to public health or welfare, or the environment. SDs shall include with any notice all available documentation supporting their claim that the delay was attributable to a force majeure. SDs shall be deemed to know of any circumstance of which SDs, any entity controlled by SDs, or SDs' contractors or subcontractors knew or should have known. Failure to comply with the above requirements regarding an event shall preclude SDs from asserting any claim of force majeure regarding that event, provided, however, that if EPA, despite the late or incomplete notice, is able to assess to its satisfaction whether the event is a force majeure under ¶ 44 and whether SDs have exercised their best efforts under ¶ 44, EPA may, in its unreviewable discretion, excuse in writing SDs' failure to submit timely or complete notices under this Paragraph.

46.    If EPA agrees that the delay or anticipated delay is attributable to a force majeure, the time for performance of the obligations under this CD that are affected by the force majeure will be extended by EPA for such time as is necessary to complete those obligations. An extension of the time for performance of the obligations affected by the force majeure shall not, of itself, extend the time for performance of any other obligation. If EPA does not agree that the delay or anticipated delay has been or will be caused by a force majeure, EPA will notify SDs in writing of its decision. If EPA agrees that the delay is attributable to a force majeure,

47

EPA will notify SDs in writing of the length of the extension, if any, for performance of the obligations affected by the force majeure.

47.     If SDs elect to invoke the dispute resolution procedures set forth in Section XIV (Dispute Resolution) regarding EPA's decision, they shall do so no later than 15 days after receipt of EPA's notice. In any such proceeding, SDs shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a force majeure, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that SDs complied with the requirements of ¶¶ 44 and 45. If SDs carry this burden, the delay at issue shall be deemed not to be a violation by SDs of the affected obligation of this CD identified to EPA and the Court.

48.     The failure by EPA to timely complete any obligation under the CD or under the SOW is not a violation of the CD, provided, however, that if such failure prevents SDs from meeting one or more deadlines in the SOW, SDs may seek relief under this Section.

## XIV.    DISPUTE RESOLUTION

49.     Unless otherwise expressly provided for in this CD, the dispute resolution procedures of this Section shall be the exclusive mechanism to resolve disputes regarding this CD. However, the procedures set forth in this Section shall not apply to actions by the United States to enforce obligations of SDs that have not been disputed in accordance with this Section.

50.     A dispute shall be considered to have arisen when one party sends the other parties a written Notice of Dispute. Any dispute regarding this CD shall in the first instance

48

be the subject of informal negotiations between the parties to the dispute. The period for informal negotiations shall not exceed 20 days from the time the dispute arises, unless it is modified by written agreement of the parties to the dispute.

51. **Statements of Position**

a. In the event that the parties cannot resolve a dispute by informal negotiations under the preceding Paragraph, then the position advanced by EPA shall be considered binding unless, within 30 days after the conclusion of the informal negotiation period, SDs invoke the formal dispute resolution procedures of this Section by serving on the United States a written Statement of Position on the matter in dispute, including, but not limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by SDs. The Statement of Position shall specify SDs' position as to whether formal dispute resolution should proceed under ¶ 52 (Record Review) or 53.

b. Within 30 days after receipt of SDs' Statement of Position, EPA will serve on SDs its Statement of Position, including, but not limited to, any factual data, analysis, or opinion supporting that position and all supporting documentation relied upon by EPA. EPA's Statement of Position shall include a statement as to whether formal dispute resolution should proceed under ¶ 52 (Record Review) or 53. Within 30 days after receipt of EPA's Statement of Position, SDs may submit a Reply.

c. If there is disagreement between EPA and SDs as to whether dispute resolution should proceed under ¶ 52 (Record Review) or 53, the parties to the dispute shall follow the procedures set forth in the Paragraph determined by EPA to be applicable. However, if SDs ultimately appeal to the Court to resolve the dispute, the Court shall

49

determine which Paragraph is applicable in accordance with the standards of applicability set forth in ¶¶ 52 and 53.

52.  **Record Review**. Formal dispute resolution for disputes pertaining to the selection or adequacy of any response action and all other disputes that are accorded review on the administrative record under applicable principles of administrative law shall be conducted pursuant to the procedures set forth in this Paragraph. For purposes of this Paragraph, the adequacy of any response action includes, without limitation, the adequacy or appropriateness of plans, procedures to implement plans, or any other items requiring approval by EPA under this CD, and the adequacy of the performance of response actions taken pursuant to this CD. Nothing in this CD shall be construed to allow any dispute by SDs regarding the validity of the ROD's provisions.

a.  An administrative record of the dispute shall be maintained by EPA and shall contain all statements of position, including supporting documentation, submitted pursuant to this Section. Where appropriate, EPA may allow submission of supplemental statements of position by the parties to the dispute.

b.  The Director of the Superfund Division, EPA Region 5, will issue a final administrative decision resolving the dispute based on the administrative record described in ¶ 52.a. This decision shall be binding upon SDs, subject only to the right to seek judicial review pursuant to ¶¶ 52.c and 52.d.

c.  Any administrative decision made by EPA pursuant to ¶ 52.b shall be reviewable by this Court, provided that a motion for judicial review of the decision is filed by SDs with the Court and served on all Parties within 10 days after receipt of EPA's decision. The motion shall include a description of the matter in dispute, the efforts made by the parties

50

to resolve it, the relief requested, and the schedule, if any, within which the dispute must be resolved to ensure orderly implementation of this CD. The United States may file a response to SDs' motion.

        d.      In proceedings on any dispute governed by this Paragraph, SDs shall have the burden of demonstrating that the decision of the Superfund Division Director is arbitrary and capricious or otherwise not in accordance with law. Judicial review of EPA's decision shall be on the administrative record compiled pursuant to ¶ 52.a.

53.     Formal dispute resolution for disputes that neither pertain to the selection or adequacy of any response action nor are otherwise accorded review on the administrative record under applicable principles of administrative law, shall be governed by this Paragraph.

        a.      The Director of the Superfund Division, EPA Region 5, will issue a final decision resolving the dispute based on the statements of position and reply, if any, served under ¶ 51. The Superfund Division Director's decision shall be binding on SDs unless, within 10 days after receipt of the decision, SDs file with the Court and serve on the parties a motion for judicial review of the decision setting forth the matter in dispute, the efforts made by the parties to resolve it, the relief requested, and the schedule, if any, within which the dispute must be resolved to ensure orderly implementation of the CD. The United States may file a response to SDs' motion.

        b.      Notwithstanding ¶ T of Section I (Background) (CERCLA § 113(j) record review of ROD and Work), judicial review of any dispute governed by this Paragraph shall be governed by applicable principles of law.

54.     The invocation of formal dispute resolution procedures under this Section does not extend, postpone, or affect in any way any obligation of SDs under this CD, except as

51

provided in ¶ 32 (Contesting Future Response Costs), as agreed by EPA, or as determined by the Court. Stipulated penalties with respect to the disputed matter shall continue to accrue, but payment shall be stayed pending resolution of the dispute, as provided in ¶ 62. Notwithstanding the stay of payment, stipulated penalties shall accrue from the first day of noncompliance with any applicable provision of this CD. In the event that SDs do not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section XV (Stipulated Penalties).

## XV.    STIPULATED PENALTIES

55.    SDs shall be liable to the United States for stipulated penalties in the amounts set forth in ¶¶ 56.a and 57 for failure to comply with the obligations specified in ¶¶ 56.b and 57, unless excused under Section XIII (Force Majeure). "Comply" as used in the previous sentence includes compliance by SDs with all applicable requirements of this CD, within the deadlines established under this CD. If an initially submitted or resubmitted deliverable contains a material defect, and the deliverable is disapproved or modified by EPA under ¶ 6.6(a) (Initial Submissions) or 6.6(b) (Resubmissions) of the SOW due to such material defect, then the material defect shall constitute a lack of compliance for purposes of this Paragraph.

56.    **Stipulated Penalty Amounts – Work (Including Payments and Excluding Deliverables).**

a.    The following stipulated penalties shall accrue per violation per day for any noncompliance identified in ¶ 56.b:

| Period of Noncompliance | Penalty Per Violation Per Day |
|---|---|
| 1st through 14th day | $500 |
| 15th through 30th day | $1,500 |
| 31st day and beyond | $2,000 |

b.      **Obligations**

(1)      Failure to pay any amount due under Section X (Payments for
Response Costs);

(2)      Failure to establish and maintain financial assurance in accordance
with Section IX (Financial Assurance);

(3)      Failure to establish an escrow account to hold any disputed Future
Response Costs under ¶ 32 (Contesting Future Response Costs);

(4)      Failure to timely initiate Remedial Action Construction or to
complete the Remedial Action;

(5)      Failure to timely implement the O&M Plan;

(6)      Failure to conduct performance monitoring as required by either
the O&M Plan or the Periodic Review Support Plan;

(7)      Failure to timely implement the Institutional
Control Implementation and Assurance Plan;

(8)      Failure to establish or maintain the required insurance pursuant
to Section XII of this Consent Decree;

(9)      Failure to make best efforts to obtain or to provide access or to
execute the required Institutional Controls and submit them to EPA pursuant
to Section VIII of this Consent Decree;

(10)      Failure to timely make payment of Future Response Costs
pursuant to Section X of this Consent Decree; or

(11)    Failure to initiate or complete any further response actions

EPA selects for Sites O, Q, R, or S pursuant to this Consent Decree.

57.    **Stipulated Penalty Amounts – Deliverables**.

The following stipulated penalties shall accrue per violation per day for failure to submit

timely or adequate deliverables pursuant to the CD other than those specified in ¶ 56.b:

| Period of Noncompliance | Penalty Per Violation Per Day |
|---|---|
| 1st through 14th day | $500 |
| 15th through 30th day | $1,250 |
| 31st day and beyond | $2,500 |

58.    In the event that EPA assumes performance of a portion or all of the Work

pursuant to ¶ 72 (Work Takeover), SDs shall be liable for a stipulated penalty in the amount

of $250,000. Stipulated penalties under this Paragraph are in addition to the remedies

available under ¶¶ 25 (Access to Financial Assurance by EPA) and 72 (Work Takeover).

59.    All penalties shall begin to accrue on the day after the complete performance is

due or the day a violation occurs and shall continue to accrue through the final day of the

correction of the noncompliance or completion of the activity. However, stipulated penalties

shall not accrue: (a) with respect to a deficient submission under ¶ 6.6 (Approval of

Deliverables) of the SOW, during the period, if any, beginning on the 31st day after EPA's

receipt of such submission until the date that EPA notifies SDs of any deficiency; (b) with

respect to a decision by the Director of the Superfund Division, EPA Region 5, under ¶ 52.b or

53.a of Section XIV (Dispute Resolution), during the period, if any, beginning on the 31st day

after the date that SDs' reply to EPA's Statement of Position is received until the date that the

Director issues a final decision regarding such dispute; or (c) with respect to judicial review by

this Court of any dispute under Section XIV (Dispute Resolution), during the period, if any,

54

beginning on the 31st day after the Court's receipt of the final submission regarding the dispute until the date that the Court issues a final decision regarding such dispute. Nothing in this CD shall prevent the simultaneous accrual of separate penalties for separate violations of this CD.

60.     Following EPA's determination that SDs have failed to comply with a requirement of this CD, EPA may give SDs written notification of the same and describe the noncompliance. EPA may send SDs a written demand for payment of the penalties. However, penalties shall accrue as provided in the preceding Paragraph regardless of whether EPA has notified SDs of a violation.

61.     All penalties accruing under this Section shall be due and payable to the United States within 30 days after SDs' receipt from EPA of a demand for payment of the penalties, unless SDs invoke the Dispute Resolution procedures under Section XIV (Dispute Resolution) within the 30-day period. All payments to the United States under this Section shall indicate that the payment is for stipulated penalties and shall be made in accordance with ¶ 31.b (instructions for future response cost payments).

62.     Penalties shall continue to accrue as provided in ¶ 59 during any dispute resolution period, but need not be paid until the following:

        a.      If the dispute is resolved by agreement of the parties or by a decision of EPA that is not appealed to this Court, accrued penalties determined to be owed shall be paid to EPA within 15 days after the agreement or the receipt of EPA's decision or order;

        b.      If the dispute is appealed to this Court and the United States prevails in whole or in part, SDs shall pay all accrued penalties determined by the Court to be owed to EPA within 60 days after receipt of the Court's decision or order, except as provided in ¶ 62.c;

   c.  If the District Court's decision is appealed by any Party, SDs shall pay all accrued penalties determined by the District Court to be owed to the United States into an interest-bearing escrow account, established at a duly chartered bank or trust company that is insured by the FDIC, within 60 days after receipt of the Court's decision or order. Penalties shall be paid into this account as they continue to accrue, at least every 60 days. Within 15 days after receipt of the final appellate court decision, the escrow agent shall pay the balance of the account to EPA or to SDs to the extent that they prevail.

   63.  If SDs fail to pay stipulated penalties when due, SDs shall pay Interest on the unpaid stipulated penalties as follows: (a) if SDs have timely invoked dispute resolution such that the obligation to pay stipulated penalties has been stayed pending the outcome of dispute resolution, Interest shall accrue from the date stipulated penalties are due pursuant to ¶ 59 until the date of payment; and (b) if SDs fail to timely invoke dispute resolution, Interest shall accrue from the date of demand under ¶ 60 until the date of payment. If SDs fail to pay stipulated penalties and Interest when due, the United States may institute proceedings to collect the penalties and Interest.

   64.  The payment of penalties and Interest, if any, shall not alter in any way SDs' obligation to complete the performance of the Work required under this CD.

   65.  Nothing in this CD shall be construed as prohibiting, altering, or in any way limiting the ability of the United States to seek any other remedies or sanctions available by virtue of SDs' violation of this CD or of the statutes and regulations upon which it is based, including, but not limited to, penalties pursuant to Section 122(*l*) of CERCLA, 42 U.S.C. § 9622(*l*), provided, however, that the United States shall not seek civil penalties pursuant to

Section 122(*l*) of CERCLA for any violation for which a stipulated penalty is provided in this CD, except in the case of a willful violation of this CD.

66.     Notwithstanding any other provision of this Section, the United States may, in its unreviewable discretion, waive any portion of stipulated penalties that have accrued pursuant to this CD.

## XVI.     COVENANTS BY THE UNITED STATES

67.     **Covenants for SDs, Settling Non-Performing Owners, and Settling Non-Participating Parties by United States.** Except as provided in ¶ 71 (General Reservations of Rights), the United States covenants not to sue or to take administrative action against SDs, Settling Non-Performing Owners, and Settling Non-Participating Parties pursuant to Sections 106 and 107(a) of CERCLA for the Work, Past Response Costs, and Future Response Costs. These covenants shall take effect upon the Effective Date. These covenants are conditioned upon the satisfactory performance by SDs, Settling Non-Performing Owners, and Settling Non-Participating Parties of their obligations under this CD. These covenants extend only to SDs, Settling Non-Performing Owners, and Settling Non-Participating Parties and do not extend to any other person.

68.     **United States' Pre-Certification Reservations**. Notwithstanding any other provision of this CD, the United States reserves, and this CD is without prejudice to, the right to institute proceedings in this action or in a new action, and/or to issue an administrative order, seeking to compel SDs to perform further response actions relating to the Site and/or to pay the United States for additional costs of response if, (a) prior to Certification of RA Completion, (1) conditions at the Site, previously unknown to EPA, are discovered, or (2) information,

57

previously unknown to EPA, is received, in whole or in part, and (b) EPA determines that these previously unknown conditions or information together with any other relevant information indicates that the RA is not protective of human health or the environment.

69.   **United States' Post-Certification Reservations**. Notwithstanding any other provision of this CD, the United States reserves, and this CD is without prejudice to, the right to institute proceedings in this action or in a new action, and/or to issue an administrative order, seeking to compel SDs to perform further response actions relating to the Site and/or to pay the United States for additional costs of response if, (a) subsequent to Certification of RA Completion, (1) conditions at the Site, previously unknown to EPA, are discovered, or (2) information, previously unknown to EPA, is received, in whole or in part, and (b) EPA determines that these previously unknown conditions or this information together with other relevant information indicate that the RA is not protective of human health or the environment.

70.   For purposes of ¶ 68 (United States' Pre-Certification Reservations), the information and the conditions known to EPA will include only that information and those conditions known to EPA as of the date the ROD was signed and set forth in the ROD for the Site and the administrative record supporting the ROD. For purposes of ¶ 69 (United States' Post-Certification Reservations), the information and the conditions known to EPA shall include only that information and those conditions known to EPA as of the date of Certification of RA Completion and set forth in the ROD, the administrative record supporting the ROD, the post-ROD administrative record, or in any information received by EPA pursuant to the requirements of this CD prior to Certification of RA Completion.

71.   **General Reservations of Rights**. The United States reserves, and this CD is without prejudice to, all rights against SDs, Settling Non-Performing Owners, and Settling

58

Non-Participating Parties with respect to all matters not expressly included within Plaintiff's covenants. Notwithstanding any other provision of this CD, the United States reserves all rights against SDs, Settling Non-Performing Owners, and Settling Non-Participating Parties with respect to:

        a.      liability for failure by SDs, Settling Non-Performing Owners, and Settling Non-Participating Parties to meet a requirement of this CD;

        b.      liability arising from the past, present, or future disposal, release, or threat of release of Waste Material outside of the Site;

        c.      liability based on the ownership of the Site by SDs, Settling Non-Performing Owners, and Settling Non-Participating Parties when such ownership commences after signature of this CD by SDs, Settling Non-Performing Owners, and Settling Non-Participating Parties;

        d.      liability based on the operation of the Site by SDs, Settling Non-Performing Owners, and Settling Non-Participating Parties when such operation commences after signature of this CD by SDs, Settling Non-Performing Owners, and Settling Non-Participating Parties and does not arise solely from SDs' performance of the Work;

        e.      liability based on SDs' transportation, treatment, storage, or disposal, or arrangement for transportation, treatment, storage, or disposal of Waste Material at or in connection with the Site, other than as provided in the ROD, the Work, or otherwise ordered by EPA, after signature of this CD by SDs;

        f.      liability for damages for injury to, destruction of, or loss of natural resources, and for the costs of any natural resource damage assessments;

        g.      criminal liability;

       h.      liability for violations of federal or state law that occur during or after implementation of the Work; and

       i.      liability, prior to achievement of Performance Standards, for additional response actions that EPA determines are necessary to achieve and maintain Performance Standards or to carry out and maintain the effectiveness of the remedy set forth in the ROD, but that cannot be required pursuant to ¶ 13 (Modification of SOW or Related Deliverables);

       j.      liability for additional operable units at the Site or the final response action; and

       k.      liability for costs that the United States will incur regarding the Site but that are not within the definition of Future Response Costs.

### 72.    **Work Takeover**

       a.      In the event EPA determines that SDs: (1) have ceased implementation of any portion of the Work; (2) are seriously or repeatedly deficient or late in their performance of the Work; or (3) are implementing the Work in a manner that may cause an endangerment to human health or the environment, EPA may issue a written notice ("Work Takeover Notice") to SDs. Any Work Takeover Notice issued by EPA will specify the grounds upon which such notice was issued and will provide SDs a period of 10 days within which to remedy the circumstances giving rise to EPA's issuance of such notice.

       b.      If, after expiration of the 10-day notice period specified in ¶ 72.a, SDs have not remedied to EPA's satisfaction the circumstances giving rise to EPA's issuance of the relevant Work Takeover Notice, EPA may at any time thereafter assume the performance of all or any portion(s) of the Work as EPA deems necessary ("Work Takeover"). EPA will notify SDs in

writing (which writing may be electronic) if EPA determines that implementation of a Work Takeover is warranted under this ¶ 72.b. Funding of Work Takeover costs is addressed under ¶ 25 (Access to Financial Assurance by EPA).

    c.  SDs may invoke the procedures set forth in ¶ 52 (Record Review), to dispute EPA's implementation of a Work Takeover under ¶ 72.b. However, notwithstanding SDs' invocation of such dispute resolution procedures, and during the pendency of any such dispute, EPA may in its sole discretion commence and continue a Work Takeover under ¶ 72.b until the earlier of (1) the date that SDs remedy, to EPA's satisfaction, the circumstances giving rise to EPA's issuance of the relevant Work Takeover Notice, or (2) the date that a final decision is rendered in accordance with ¶ 52 (Record Review) requiring EPA to terminate such Work Takeover.

  73.  Notwithstanding any other provision of this CD, the United States retains all authority and reserves all rights to take any and all response actions authorized by law.

## XVII. COVENANTS BY SETTLING DEFENDANTS

  74.  **Covenants by SDs, Settling Non-Performing Owners, and Settling Non-Participating Parties.** Subject to the reservations in ¶ 76, SDs, Settling Non-Performing Owners, and Settling Non-Participating Parties covenant not to sue and agree not to assert any claims or causes of action against the United States with respect to the Work, past response actions regarding the Site, Past Response Costs, Future Response Costs, and this CD, including, but not limited to:

a.       any direct or indirect claim for reimbursement from the EPA

Hazardous Substance Superfund through CERCLA §§ 106(b)(2), 107, 111, 112 or 113, or any

other provision of law;

b.       any claims under CERCLA §§ 107 or 113, RCRA Section 7002(a),

42 U.S.C. § 6972(a), or state law regarding the Work, past response actions regarding the Site,

Past Response Costs, Future Response Costs, and this CD;

c.       any claims arising out of response actions at or in connection with the

Site, including any claim under the United States Constitution, the Illinois Constitution, the

Tucker Act, 28 U.S.C. § 1491, the Equal Access to Justice Act, 28 U.S.C. § 2412, or at common

law; and

d.       any direct or indirect claim for disbursement from the Sauget Area 2

Special Account or Sauget Area 2 Remediation Account, except as provided in Section XI

(Disbursement of Special Account Funds).

75.      Except as provided in ¶¶ 78 (Waiver of Claims by SDs, Settling Non-Performing

Owners and Settling Non-Participating Parties) and 85 (Res Judicata and Other Defenses), the

covenants in this Section shall not apply if the United States brings a cause of action or issues an

order pursuant to any of the reservations in Section XVI (Covenants by the United States), other

than in ¶¶ 71.a (claims for failure to meet a requirement of the CD), 71.g (criminal liability), and

71.h (violations of federal/state law during or after implementation of the Work), but only to the

extent that SDs,' Settling Non-Performing Owners,' and Settling Non-Participating Parties'

claims arise from the same response action, response costs, or damages that the United States is

seeking pursuant to the applicable reservation.

76.     SDs, Settling Non-Performing Owners, and Settling Non-Participating Parties reserve, and this CD is without prejudice to, claims against the United States, subject to the provisions of Chapter 171 of Title 28 of the United States Code, and brought pursuant to any statute other than CERCLA or RCRA and for which the waiver of sovereign immunity is found in a statute other than CERCLA or RCRA, for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the United States, as that term is defined in 28 U.S.C. § 2671, while acting within the scope of his or her office or employment under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred. However, the foregoing shall not include any claim based on EPA's selection of response actions, or the oversight or approval of SDs,' Settling Non-Performing Owners, and Settling Non-Participating Parties deliverables or activities.

77.     Nothing in this CD shall be deemed to constitute approval or preauthorization of a claim within the meaning of Section 111 of CERCLA, 42 U.S.C. § 9611, or 40 C.F.R. § 300.700(d).

78.     **Waiver of Claims by SDs, Settling Non-Performing Owners, and Settling Non-Participating Parties.**

a.     SDs, Settling Non-Performing Owners, and Settling Non-Participating Parties agree not to assert any claims and to waive all claims or causes of action (including but not limited to claims or causes of action under Sections 107(a) and 113 of CERCLA) that they may have:

(1)     **De Micromis Waiver**. For all matters relating to the Site against any person where the person's liability to SDs, Settling Non-Performing Owners,

63

and Settling Non-Participating Parties with respect to the Site is based solely on having arranged for disposal or treatment, or for transport for disposal or treatment, of hazardous substances at the Site, or having accepted for transport for disposal or treatment of hazardous substances at the Site, if all or part of the disposal, treatment, or transport occurred before April 1, 2001, and the total amount of material containing hazardous substances contributed by such person to the Site was less than 110 gallons of liquid materials or 200 pounds of solid materials;

(2)  **MSW Waiver**. For all matters relating to the Site against any person where the person's liability to SDs, Settling Non-Performing Owners, and Settling Non-Participating Parties with respect to the Site is based solely on having arranged for disposal or treatment, or for transport for disposal or treatment, of MSW at the Site, if the volume of MSW disposed, treated, or transported by such person to the Site did not exceed 0.2% of the total volume of waste at the Site; and

(3)  ***De Minimis*/Ability to Pay Waiver**. For response costs relating to the Site against any person that has entered or in the future enters into a final CERCLA § 122(g) *de minimis* settlement, or a final settlement based on limited ability to pay with EPA with respect to the Site.

b.  **Exceptions to Waivers**

(1)  The waivers under this ¶ 78 shall not apply with respect to any defense, claim, or cause of action that an SD, a Settling Non-Performing Owner, or a Settling Non-Participating Party may have against any person otherwise

64

covered by such waivers if such person asserts a claim or cause of action relating to the Site against such SD, Settling Non-Performing Owner, or Settling Non-Participating Party.

(2)     The waiver under ¶ 78.a(1) (De Micromis Waiver) shall not apply to any claim or cause of action against any person otherwise covered by such waiver if EPA determines that: (i) the materials containing hazardous substances contributed to the Site by such person contributed significantly or could contribute significantly, either individually or in the aggregate, to the cost of the response action or natural resource restoration at the Site; or (ii) such person has failed to comply with any information request or administrative subpoena issued pursuant to Section 104(e) or 122(e)(3)(B) of CERCLA, 42 U.S.C. § 9604(e) or 9622(e)(3)(B), or Section 3007 of RCRA, 42 U.S.C. § 6927, or has impeded or is impeding, through action or inaction, the performance of a response action or natural resource restoration with respect to the Site; or if (iii) such person has been convicted of a criminal violation for the conduct to which the waiver would apply and that conviction has not been vitiated on appeal or otherwise.

(3)     The waiver under ¶ 78.a(2) (MSW Waiver) shall not apply to any claim or cause of action against any person otherwise covered by such waiver if EPA determines that: (i) the materials containing MSW contributed to the Site by such person contributed significantly or could contribute significantly, either individually or in the aggregate, to the cost of the response action or natural resource restoration at the Site; or (ii) such person has failed to comply with any information request or administrative subpoena issued pursuant to Section 104(e)

65

or 122(e)(3)(B) of CERCLA, 42 U.S.C. § 9604(e) or 9622(e)(3)(B), or Section 3007 of RCRA, 42 U.S.C. § 6927, or has impeded or is impeding, through action or inaction, the performance of a response action or natural resource restoration with respect to the Site.

        (4)    The waivers under ¶ 78 shall not apply with respect to any claim or cause of action of SDs against the insurers for Sauget & Company, Paul Sauget, and the Village of Sauget.

79.    SDs agree not to seek judicial review of any final rule listing Sauget Area 2 on the National Priorities List based on a claim that changed site conditions that resulted from the performance of the Work in any way affected the basis for listing the Site.

## XVIII.  EFFECT OF SETTLEMENT; CONTRIBUTION

80.    Except as provided in ¶ 78 (Waiver of Claims by SDs, Settling Non-Performing Owners, and Settling Non-Participating Parties), nothing in this CD shall be construed to create any rights in, or grant any cause of action to, any person not a Party to this CD. Except as provided in Section XVII (Covenants by Settling Defendants), each of the Parties expressly reserves any and all rights (including, but not limited to, pursuant to Section 113 of CERCLA, 42 U.S.C. § 9613), defenses, claims, demands, and causes of action that each Party may have with respect to any matter, transaction, or occurrence relating in any way to the Site against any person not a Party hereto. Nothing in this CD diminishes the right of the United States, pursuant to Section 113(f)(2) and (3) of CERCLA, 42 U.S.C. § 9613(f)(2)-(3), to pursue any such persons to obtain additional response costs or response action and to enter into settlements that give rise to contribution protection pursuant to Section 113(f)(2).

66

81.     The Parties agree, and by entering this CD this Court finds, that this CD constitutes a judicially-approved settlement pursuant to which each SD, Settling Non-Performing Owner, and Settling Non-Participating Party has, as of the Effective Date, resolved liability to the United States within the meaning of Section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2), and is entitled, as of the Effective Date, to protection from contribution actions or claims as provided by Section 113(f)(2) of CERCLA, or as may be otherwise provided by law, for the "matters addressed" in this CD. The "matters addressed" in this CD are the Work, Past Response Costs, and Future Response Costs.

82.     The Parties further agree, and by entering this CD this Court finds, that the complaint filed by the United States in this action is a civil action within the meaning of Section 113(f)(1) of CERCLA, 42 U.S.C. § 9613(f)(1), and that this CD constitutes a judicially-approved settlement pursuant to which each SD, Settling Non-Performing Owner, and Settling Non-Participating Party has, as of the Effective Date, resolved liability to the United States within the meaning of Section 113(f)(3)(B) of CERCLA, 42 U.S.C. § 9613(f)(3)(B).

83.     Each SD shall, with respect to any suit or claim brought by it for matters related to this CD, notify the United States in writing no later than 60 days prior to the initiation of such suit or claim. The United States is aware that Solutia and Pharmacia have been involved in litigation with the insurers for Sauget & Company, Paul Sauget, and the Village of Sauget, and with Rogers Cartage Company and its insurers and the notice requirements in this Paragraph and ¶ 83 do not apply to those suits.

84.     Each SD, Settling Non-Performing Owner, and Settling Non-Participating Party shall, with respect to any suit or claim brought against it for matters related to this CD,

notify in writing the United States within 10 days after service of the complaint on such SD, Settling Non-Performing Owner, or Settling Non-Participating Party. In addition, each SD, Settling Non-Performing Owner, or Settling Non-Participating Party shall notify the United States within 10 days after service or receipt of any Motion for Summary Judgment and within 10 days after receipt of any order from a court setting a case for trial.

85.     **Res Judicata and Other Defenses**. In any subsequent administrative or judicial proceeding initiated by the United States for injunctive relief, recovery of response costs, or other appropriate relief relating to the Site, SDs, Settling Non-Performing Owners, and Settling Non-Participating Parties shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States in the subsequent proceeding were or should have been brought in the instant case; provided, however, that nothing in this Paragraph affects the enforceability of the covenants not to sue set forth in Section XVI (Covenants by the United States).

## XIX.    ACCESS TO INFORMATION

86.     SDs shall provide to EPA, upon request, copies of all records, reports, documents, and other information (including records, reports, documents, and other information in electronic form) (hereinafter referred to as "Records") within SDs' possession or control or that of their contractors or agents relating to activities at the Site or to the implementation of this CD, including, but not limited to, sampling, analysis, chain of custody records, manifests, trucking logs, receipts, reports, sample traffic routing, correspondence, or other documents or information regarding the Work. SDs shall also make available to EPA, for purposes of

investigation, information gathering, or testimony, their employees, agents, or representatives with knowledge of relevant facts concerning the performance of the Work.

87. **Privileged and Protected Claims**

a.      SDs may assert that all or part of a Record requested by Plaintiff is privileged or protected as provided under federal law, in lieu of providing the Record, provided SDs comply with ¶ 87.b, and except as provided in ¶ 87.c.

b.      If SDs assert a claim of privilege or protection, they shall provide Plaintiff with the following information regarding such Record: its title; its date; the name, title, affiliation (*e.g.,* company or firm), and address of the author, of each addressee, and of each recipient; a description of the Record's contents; and the privilege or protection asserted. If a claim of privilege or protection applies only to a portion of a Record, SDs shall provide the Record to Plaintiff in redacted form to mask the privileged or protected portion only. SDs shall retain all Records that they claim to be privileged or protected until Plaintiff has had a reasonable opportunity to dispute the privilege or protection claim and any such dispute has been resolved in the SDs' favor.

c.      SDs may make no claim of privilege or protection regarding: (1) any data regarding the Site, including, but not limited to, all sampling, analytical, monitoring, hydrogeologic, scientific, chemical, radiological or engineering data, or the portion of any other Record that evidences conditions at or around the Site; or (2) the portion of any Record that SDs are required to create or generate pursuant to this CD.

88. **Business Confidential Claims**. SDs may assert that all or part of a Record provided to Plaintiff under this Section or Section XX (Retention of Records) is business confidential to the extent permitted by and in accordance with Section 104(e)(7)

69

of CERCLA, <u>42 U.S.C. § 9604(e)(7)</u>, and <u>40 C.F.R. § 2.203(b)</u>. SDs shall segregate and

clearly identify all Records or parts thereof submitted under this CD for which SDs

assert business confidentiality claims. Records that SDs claim to be confidential business

information will be afforded the protection specified in 40 C.F.R. Part 2, Subpart B. If no

claim of confidentiality accompanies Records when they are submitted to EPA, or if

EPA has notified SDs that the Records are not confidential under the standards of

Section 104(e)(7) of CERCLA or 40 C.F.R. Part 2, Subpart B, the public may be given

access to such Records without further notice to SDs.

89.     If relevant to the proceeding, the Parties agree that validated sampling or

monitoring data generated in accordance with the SOW and reviewed and approved by EPA

shall be admissible as evidence, without objection, in any proceeding under this CD.

90.     Notwithstanding any provision of this CD, Plaintiff retains all of its information

gathering and inspection authorities and rights, including enforcement actions related thereto,

under CERCLA, RCRA, and any other applicable statutes or regulations.

## XX.    RETENTION OF RECORDS

91.     Until 10 years after EPA's Certification of Work Completion for the final

Specific Project under ¶ 4.7 (Certification of Work Completion for Each Specific Project) of the

SOW, each SD shall preserve and retain all non-identical copies of Records (including Records

in electronic form) now in its possession or control or that come into its possession or control

that relate in any manner to its liability under CERCLA with respect to the Site, provided,

however, that SDs who are potentially liable as owners or operators of the Site must retain, in

addition, all Records that relate to the liability of any other person under CERCLA with respect

to the Site. Each SD must also retain, and instruct its contractors and agents to preserve, for the same period of time specified above all non- identical copies of the last draft or final version of any Records (including Records in electronic form) now in its possession or control or that come into its possession or control that relate in any manner to the performance of the Work, provided, however, that each SD (and its contractors and agents) must retain, in addition, copies of all data generated during the performance of the Work and not contained in the aforementioned Records required to be retained. Each of the above record retention requirements shall apply regardless of any corporate retention policy to the contrary.

92.     At the conclusion of this record retention period, SDs shall notify the United States at least 90 days prior to the destruction of any such Records, and, upon request by the United States, and except as provided in ¶ 87 (Privileged and Protected Claims), SDs shall deliver any such Records to EPA.

93.     Each SD certifies individually that, to the best of its knowledge and belief, after thorough inquiry, it has not altered, mutilated, discarded, destroyed, or otherwise disposed of any Records (other than identical copies) relating to its potential liability regarding the Site since notification of potential liability by the United States or the State and that it has fully complied with any and all EPA and State requests for information regarding the Site pursuant to Sections 104(e) and 122(e)(3)(B) of CERCLA, 42 U.S.C. §§ 9604(e) and 9622(e)(3)(B), and Section 3007 of RCRA, 42 U.S.C. § 6927, and state law.

## XXI.   NOTICES AND SUBMISSIONS

94.     All approvals, consents, deliverables, modifications, notices, notifications, objections, proposals, reports, and requests specified in this CD must be in writing unless

71

otherwise specified. Whenever, under this CD, notice is required to be given, or a report or other document is required to be sent, by one Party to another, it must be directed to the person(s) specified below at the address(es) specified below. Any Party may change the person and/or address applicable to it by providing notice of such change to all Parties. All notices under this Section are effective upon receipt, unless otherwise specified. Notices required to be sent to EPA, and not to the United States, should not be sent to the DOJ. Except as otherwise provided, notice to a Party by email (if that option is provided below) or by regular mail in accordance with this Section satisfies any notice requirement of the CD regarding such Party.

As to the United States:                    Chief, Environmental Enforcement Section
                                            Environment and Natural Resources Division
                                            U.S. Department of Justice
                                            P.O. Box 7611
                                            Washington, D.C.  20044-7611
                                            Re: DJ # 90-11-2-06089/7

As to EPA:                                  Douglas Ballotti
                                            Director, Superfund Division
                                            U.S. Environmental Protection Agency
                                            Region 5
                                            77 W. Jackson Blvd.
                                            Chicago, IL 60604-3590
                                            ballotti.doug@epa.gov

and:                                        Stephanie Linebaugh
                                            EPA Project Manager
                                            U.S. Environmental Protection Agency, Region 5
                                            77 W. Jackson Blvd. (SR-6J)
                                            Chicago, IL 60604-3590
                                            linebaugh.stephanie@epa.gov

| As to the Regional Comptroller's Office | Richard Hackley<br>U.S. Environmental Protection Agency, Region 5<br>77 W. Jackson Blvd. (MF-10J)<br>Chicago, Illinois  60604-3590<br>hackley.richard@epa.gov |
|---|---|
| As to EPA Cincinnati Finance Center: | EPA Cincinnati Finance Center<br>26 W. Martin Luther King Drive<br>Cincinnati, Ohio 45268<br>cinwd_acctsreceivable@epa.gov |
| and: | Brian Conrath<br>Remedial Project Manager<br>Illinois Environmental Protection Agency<br>1201 N. Grand Avenue East<br>P.O. Box 19276<br>Springfield, IL  62794-9276<br>brian.conrath@illinois.gov |
| As to SDs: | Michelle Ryan<br>Assistant Counsel<br>Illinois Environmental Protection Agency<br>1201 N. Grand Avenue East<br>P.O. Box 19276<br>Springfield, IL  62794-9276<br>michelle.ryan@illinois.gov |
| and: | William G. Johnson<br>Settling Defendants' Project Coordinator<br>Solutia Inc.<br>575 Maryville Centre Drive<br>St Louis, MO 63141 |
| and: | Steven Addlestone<br>Senior HSES Counsel<br>Solutia Inc.<br>200 S. Wilcox Drive<br>Kingsport, TN  37662 |

Jason A. Flower
Counsel for Solutia Inc. and Pharmacia LLC
Spencer Fane LLP
1 North Brentwood Boulevard, Suite 1000
St. Louis, MO 63105
jflower@spencerfane.com

## XXII.   RETENTION OF JURISDICTION

95.     This Court retains jurisdiction over both the subject matter of this CD and SDs, Settling Non-Performing Owners, and Settling Non-Participating Parties for the duration of the performance of the terms and provisions of this CD for the purpose of enabling any of the Parties to apply to the Court at any time for such further order, direction, and relief as may be necessary or appropriate for the construction or modification of this CD, or to effectuate or enforce compliance with its terms, or to resolve disputes in accordance with Section XIV (Dispute Resolution).

## XXIII.   APPENDICES

96.     The following appendices are attached to and incorporated into this CD:

"Appendix A" is the list of proposed Settling Non-Participating Parties.

"Appendix B" is the map of the Site.

"Appendix C" is the Record of Decision.

"Appendix D" is the Statement of Work.

"Appendix E" are the signatures of Settling Non-Participating Parties that have signed this Consent Decree.

74

## XXIV.  MODIFICATION

97.     Except as provided in ¶ 13 (Modification of SOW or Related Deliverables),
material modifications to this CD, including the SOW, shall be in writing, signed by the United
States and SDs, and shall be effective upon approval by the Court. Except as provided in ¶ 13,
non-material modifications to this CD, including the SOW, shall be in writing and shall be
effective when signed by duly authorized representatives of the United States and SDs.
A modification to the SOW shall be considered material if it implements a ROD amendment
that fundamentally alters the basic features of the selected remedy within the meaning of 40
C.F.R. § 300.435(c)(2)(ii).

98.     Nothing in this CD shall be deemed to alter the Court's power to
enforce, supervise, or approve modifications to this CD.

## XXV.   LODGING AND OPPORTUNITY FOR PUBLIC COMMENT

99.     This CD shall be lodged with the Court for at least 30 days for public notice
and comment in accordance with Section 122(d)(2) of CERCLA, 42 U.S.C. § 9622(d)(2), and
28 C.F.R. § 50.7. The United States reserves the right to withdraw or withhold its consent if
the comments regarding the CD disclose facts or considerations that indicate that the CD is
inappropriate, improper, or inadequate. SDs, Settling Non-Performing Owners, and Settling
Non-Participating Parties consent to the entry of this CD without further notice.

100.    If for any reason the Court should decline to approve this CD in the form
presented, this agreement is voidable at the sole discretion of any Party and the terms of
the agreement may not be used as evidence in any litigation between the Parties.

75

## XXVI.  SIGNATORIES/SERVICE

101.    Each undersigned representative of an SD, Settling Non-Performing Owner, and Settling Non-Participating Party to this CD and the Assistant Attorney General for the Environment and Natural Resources Division of the Department of Justice or his designee certifies that he or she is fully authorized to enter into the terms and conditions of this CD and to execute and legally bind such Party to this document.

102.    Each SD, Settling Non-Performing Owner, and Settling Non-Participating Party agrees not to oppose entry of this CD by this Court or to challenge any provision of this CD unless the United States has notified SDs, Settling Non-Performing Owners, and Settling Non-Participating Parties in writing that it no longer supports entry of the CD.

103.    Each SD, Settling Non-Performing Owner, and Settling Non-Participating Party shall identify, on the attached signature page, the name, address, and telephone number of an agent who is authorized to accept service of process by mail on behalf of that Party with respect to all matters arising under or relating to this CD. Each SD, Settling Non-Performing Owner, and Settling Non-Participating Party agrees to accept service in that manner and to waive the formal service requirements set forth in Rule 4 of the Federal Rules of Civil Procedure and any applicable local rules of this Court, including, but not limited to, service of a summons. SDs, Settling Non-Performing Owners, and Settling Non-Participating Parties need not file an answer to the complaint in this action unless or until the Court expressly declines to enter this CD.

## XXVII. FINAL JUDGMENT

104.    This CD and its appendices constitute the final, complete, and exclusive agreement and understanding among the Parties regarding the settlement embodied in the

76

CD. The Parties acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those expressly contained in this CD.

105.    Upon entry of this CD by the Court, this CD shall constitute a final judgment between and among the United States and SDs, Settling Non-Performing Owners, and Settling Non-Participating Parties. The Court enters this judgment as a final judgment under Fed. R. Civ. P. 54 and 58.

SO ORDERED THIS 2nd DAY OF February, 2022

_.

David W. Dugan
United States District Judge

Signature Page for RD/RA Consent Decree regarding
Operable Unit 1 of the Sauget Area 2 Superfund Site

**FOR THE UNITED STATES OF AMERICA**:

BRUCE S. GELBER
Deputy Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice
Washington, D.C.  20530

_____

MICHAEL J. ZOELLER
Senior Counsel
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C.  20044-7611
U.S. Department of Justice
Washington, D.C.  20530


STEVEN D. WEINHOEFT
United States Attorney
Southern District of Illinois
9 Executive Dr.
Fairview Heights, IL  62208



 /s/Nathan E. Wyatt (by consent)
NATHAN E. WYATT
Chief, Civil Division
United States Attorney's Office
Southern District of Illinois
Nine Executive Drive
Fairview Heights, IL 62208
(618) 628-7000
Nathan.wyatt@usdoj.gov

78

Signature Page for RD/RA Consent Decree regarding
Operable Unit 1 of the Sauget Area 2 Superfund Site

Digitally signed by
DOUGLAS BALLOTI
Date: 2021.11.17
07:27:22 -06'00'

DOUGLAS BALLOTI
Director
Superfund & Emergency Management Division
U.S. Environmental Protection Agency
Region 5
77 West Jackson Blvd.
Chicago, IL 60604

11/17/21

THOMAS J. MARTIN
Associate Regional Counsel
U.S. Environmental Protection Agency
Region 5
77 West Jackson Blvd.
Chicago, IL 60604

Signature Page for RD/RA Consent Decree regarding
Operable Unit 1 of the Sauget Area 2 Superfund Site

**FOR SETTLING DEFENDANT
SOLUTIA INC.**

October 14, 2021
Date

EDWIN WILLIAMSON
Vice President
Eastman Chemical Company
200 S. Wilcox Drive
Kingsport, TN 37662

Agent Authorized to Accept Service
on Behalf of Above-signed Party:

Name (print): Steve Addlestone
Title: Senior HSES Counsel
Address: Eastman Chemical Company
200 S. Wilcox Drive
Kingsport, TN 37662
Phone: (423) 229-5835
email: saddlestone@eastman.com

80

SL 5201361.3

Signature Page for RD/RA Consent Decree regarding
Operable Unit 1 of the Sauget Area 2 Superfund Site

**FOR SETTLING DEFENDANT**
**PHARMACIA LLC**
By: Solutia Inc., its Attorney-in-Fact

October 14, 2021

Date

EDWIN WILLIAMSON
Vice President
Eastman Chemical Company
200 S. Wilcox Drive
Kingsport, TN  37662

Agent Authorized to Accept Service
on Behalf of Above-signed Party:

Name (print): Steve Addlestone
Title: Senior HSES Counsel
Address: Eastman Chemical Company
200 S. Wilcox Drive
Kingsport, TN 37662
Phone: (423) 229-5835
email: saddlestone@eastman.com

81

Signature Page for Consent Decree regarding the Sauget Area 2 Superfund Site

**FOR SETTING NON-PERFORMING OWNER**
**Eagle Marine Industries, Inc.**

Date: 08/20/2021

Name (print): Richard D. Burke
Title: President
Address: # 1 Riverview Avenue
              Sauget, Illinois 62201

Agent Authorized to Accept Service
on Behalf of Above-signed Party:

Name (print): Julie E. O'Keefe
Title: Partner – Armstrong Teasdale LLP
Address: 7700 Forsyth Blvd., Suite 1800
Phone: 314.552.6679
email: jokeefe@atllp.com

Signature Page for Consent Decree regarding the Sauget Area 2 Superfund Site

**FOR SETTING NON-PERFORMING OWNER**
**VILLAGE OF SAUGET**

10/12/2021
Date

Name:     Richard A. Sauget, Jr.
Title:      President, Village of Sauget
Address: 2897 Falling Springs Road
            Sauget, IL 62206

Agent Authorized to Accept Service
on Behalf of Above-signed Party:

Name:     Thomas R. Ysursa
Title:      Attorney
Address:   5111 West Main Street
            Belleville, IL 62223
Phone:     618-235-0020
email:      try@bhylaw.com

83